946 So.2d 395 (2006)
LaDonna KING and David Earl King, Appellants
v.
Ruth KING, Appellee.
No. 2004-CA-02334-COA.
Court of Appeals of Mississippi.
May 16, 2006.
Rehearing Denied October 3, 2006.
Certiorari Denied January 4, 2007.
*397 James A. Williams, Brookhaven, attorney for appellants.
Mark R. Holmes, attorney for appellee.
Before KING, C.J., IRVING, CHANDLER and ISHEE, JJ.
IRVING, J., for the Court.
¶ 1. On March 19, 2004, Ruth King filed a complaint for divorce from her husband, David Earl King, and to set aside a conveyance made to her daughter, LaDonna Ruth King. On September 29, 2004, the Walthall County Chancery Court issued an order granting the divorce and setting aside the conveyance. The chancellor ordered that Ruth be given possession of the family property, some fifty-eight acres in Walthall County, as well as the personal property accumulated during the marriage. LaDonna and David appeal the chancellor's decision, and assert the following contentions, which we quote verbatim:
ISSUE ONE
A CHANCELLOR COMMITS REVERSIBLE ERROR IN MAKING AN "EQUITABLE DISTRIBUTION," WHEN HE FAILS TO ACKNOWLEDGE THE EVIDENTIARY FACT THAT THE REAL AND PERSONAL PROPERTY WAS ACQUIRED AND IMPROVED BY THE EFFORTS OF THE ADULT CHILDREN ONE OF WHOM IS A DEFENDANT TO WHOM THE REAL PROPERTY WAS GIVEN AS COMPENSATION AND UNDER A TRUST TO PROVIDE THE WIFE A HOME AND SUPPORT FOR LIFE.
ISSUE TWO
A CHANCELLOR COMMITS REVERSIBLE ERROR WHEN THERE IS INSUFFICIENT EVIDENCE TO EVALUATE AND HE FAILS TO EVALUATE, THE PROPERTY AND FAILS TO CONSIDER GREAT AMOUNTS OF PERSONAL PROPERTY NOT LISTED.
ISSUE THREE
A CHANCELLOR COMMITS REVERSIBLE ERROR WHEN HE AWARDS ALL THE MARITAL ESTATE TO THE WIFE BECAUSE THE HUSBAND INCURRED EXPENSES OF CRIMINAL DEFENSE, PARTLY FROM BUSINESS ACTIVITIES WHICH ALLOWED ACCUMULATION OF PERSONAL PROPERTY AND CASH DISTRIBUTED TO THE WIFE BUT DOES NOT APPORTION A TAX SALE DEBT TO HER SHARE, ALL BECAUSE THE HUSBAND WAS OVERBEARING AND CONTROLLING AND HIS CONDUCT LED TO THE DIVORCE.
Finding no error, we affirm.

FACTS
¶ 2. David and Ruth were married on August 3, 1958, and last lived together as husband and wife on March 1, 2001, when *398 David was arrested.[1] Eleven children were born to the marriage, all of them now emancipated adults, although some, including LaDonna, still live on the family property. The property contains what the chancellor described as a "home compound," which includes ten bedrooms, five bathrooms, and three kitchens, among other rooms. Evidence at trial indicated that there were also other buildings on the property, including a church and candy shop. Testimony indicated that the family's primary income came from church tithes received by David, who preached at the church. The family also made money by making their own candy and other businesses.
¶ 3. The chancellor found that, although several of the children helped Ruth and David run the church, school, and candy-making, "the evidence established clearly and convincingly that all money that came into the . . . family came from the `offering plate' to David Earl King's shirt pocket, from the truck patch sales to his shirt pocket, and from the sale of peanut brittle to his shirt pocket." According to the chancellor's findings, "David Earl King . . . was completely in control of all money that came into the family." The chancellor specifically found that David "controlled all assets of the church and the school. . . ."
¶ 4. The chancellor determined the value of the marital estate by taking into account the value of the real property, personal property, and cash that had been spent between the time of David's arrest and the divorce proceedings. The chancellor found that the land and buildings were marital property because "[the property] remained in David Earl King's name as to record title . . . it was marital property because it was solely occupied and supported by the efforts of David Earl King and Ruth King, as well as other family members."
¶ 5. The chancellor found that "[t]he undisputed evidence shows and establishes clearly that David Earl King was absolutely in control of every aspect of life. . . ." Evidence introduced showed that David gave Ruth a stipend of forty to sixty dollars every two weeks, with which she was supposed to buy groceries for the entire family.[2] The chancellor noted that
when Ruth King was allowed to go on these family grocery shopping trips, she would be given a specified period of time that she could be gone. On one occasion . . . she was late and as a result of being late returning from that shopping trip she was restricted to the house for a period of three months.
There was also testimony that David physically and verbally abused Ruth. When David felt that Ruth had failed him, he would punish her. After whatever punishment was given, Ruth testified that the dispute would be resolved by Ruth apologizing to David, even when she did not believe that she had done anything wrong.
¶ 6. Sometime around 1983, David seriously injured his back while working on the farm. As a result, he was bedridden for some time. During that time, Ruth moved out of the marital bedroom because David's restlessness at night kept her from sleeping. For disputed reasons, Ruth never *399 returned to David's bedroom, and lived in the basement from that day forward.[3] Nathan Paul King, LaDonna's husband, moved into the bedroom in place of Ruth to care for David.[4]
¶ 7. On March 2, 2001, a day after David's arrest, Ruth was told to come to the courthouse to sign papers. When she arrived, Ruth was told by one of David's attorney's secretaries to come to a particular spot in the courthouse. There, Ruth was presented with a piece of paper and told to sign. Ruth testified that she did not look at what she was signing, that she was distraught and crying at the time, and that she had spent the last twenty-four hours in a state of extreme distress on account of David's arrest. The paper that Ruth was told to sign was a quitclaim deed giving LaDonna possession of the family estate. The chancellor set aside the deed, finding that a fiduciary relationship existed between Ruth, David, and LaDonna, and that undue influence had been exercised in order to get Ruth to sign the deed granting LaDonna the family estate. The chancellor further explained:
It's clear that LaDonna Ruth King does not own this property. She's holding it for the benefit of David Earl King under his express direction and control. . . . The court finds that the property was marital property beforethat she's holding it in essence in a constructive trust and that it continues to be marital property today. . . . That it would be an extreme inequity to allow David Earl King to successfully hide behind that conveyance while maintaining the control, supervision, and benefit of his property which constituted a fraud upon Ruth King, and that it is incumbent upon this court to set aside and hold for naught the 2001 conveyance. . . .
¶ 8. The chancellor also found that "Ruth King was not consulted about [the tax fraud that David was convicted for] . . . the point being that if she participated in a wrong she could not be allowed to benefit by that very action and the court finds that she did not participate in that sense." As a result, the chancellor found that there was no marital debt, even though there was a judgment against David in the amount of $336,000 for unpaid taxes. The chancellor noted that
Ruth King is not named as a judgment debtor; that judgment was not against her. . . . The court notes and finds that David Earl King was totally in charge of that business, the very fact that she, once freed of his dominance and control to some extent when he was in jail and in prison, sought to legitimize by seeking a tax ID number lends support to the fact that the decision to handle that in an illegitimate way was solely the decision of David Earl King. . . . [T]here's no evidence that he ever consulted her about any financial decisions and in fact just the opposite is indicated by the evidence. So the court finds that that debt should be taken into consideration in the overall scheme of the equitable distribution process but is not considered *400 a marital debt which Ruth King has any joint liability for.
¶ 9. In assigning an equitable distribution of the marital estate, the chancellor found that David "has either taken or caused to be taken in the form of dissipation of marital assets, and/or involuntary [sic] from Ruth King's standpoint, distribution to himself of at least $265,000," an amount that took into account money paid to attorneys and money taken from the house after David's arrest but unaccounted for at the time of the divorce proceedings. The chancellor found that both David and Ruth had contributed substantially to the accumulation of marital property and that the total marital estate was worth $632,000. The chancellor noted that the State Tax Commission might choose to pursue its judgment against the marital estate, a determination that the court had no control over. The chancellor found that David was around sixty years of age
and that it would appear that the sentence that he is serving, that his time would amount to what would likely be a life sentence for him and that his need for financial security would seem to be essentially non-existent since he is a resident of the Department of Corrections and is cared for and provided for by that department.
The chancellor also considered the nature of Ruth and David's relationship in dividing the marital property. Specifically, the chancellor pointed out that Ruth was for "18 years essentially banished from the marital bed, the control and dominance exerted by Mr. King over her, the very frugal and minuscule amounts of money that she was allowed to have access to."
¶ 10. After taking all of the above factors into consideration, the chancellor found that all personal property should be awarded to Ruth, as well as all land and improvements to the land. The chancellor noted that the value of those came to $334,100. The chancellor recognized that this distribution meant that Ruth received slightly more than half of the marital estate, but found that "under the totality of the circumstances that this is a fair and equitable distribution of the marital assets, especially considering David Earl King and his inappropriate and illegal actions are the cause of the family's financial and legal problems. It's certainly fair that Ruth King receive a slightly larger distribution of the marital assets."

ANALYSIS AND DISCUSSION OF THE ISSUES
Standard of Review
¶ 11. When reviewing a chancellor's decision in domestic relations cases, "[we] employ a limited standard of review." Phillips v. Phillips, 904 So.2d 999, 1001(¶ 8) (Miss.2004) (citing Carrow v. Carrow, 741 So.2d 200, 202(¶ 9) (Miss. 1999)). We will not reverse a chancellor's findings "unless the chancellor was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." Id. (citing Owen v. Owen, 798 So.2d 394, 398(¶ 10) (Miss.2001); Turpin v. Turpin, 699 So.2d 560, 564(¶ 14) (Miss.1997)). Where a chancellor's findings are supported by substantial evidence, we are "without the authority to disturb his conclusions, although [we] might have found otherwise as an original matter." Nichols v. Funderburk, 883 So.2d 554, 556(¶ 7) (Miss.2004) (citing In re Estate of Harris, 539 So.2d 1040, 1043 (Miss.1989)). "In reviewing a Chancellor's distribution of marital assets upon divorce, this Court's focus is upon equity, not necessarily equality." Id. at 1003(¶ 13). In other words, a chancellor's distribution may be upheld, even where the distribution of the marital property is not an even fifty-fifty split.
*401 1. Equitable Distribution and Adult Children
¶ 12. LaDonna and David contend that the chancellor erred in not taking into account the "efforts of the adult children" when making an equitable distribution of the marital property. Ruth responds that LaDonna and David failed to raise this as an issue before the trial court, and are therefore barred from raising it on appeal. LaDonna and David argue that, although their pleadings did not argue this point and no motions were made regarding it, the matter was tried by consent because evidence was presented to the chancellor indicating that the adult children had also worked on the family property.
¶ 13. The Mississippi Supreme Court has clearly stated: "It is well settled that this Court will not address issues raised for the first time on appeal." State Indus., Inc. v. Hodges, 919 So.2d 943, 947(¶ 9) (Miss.2006) (citations omitted). However, it is also true that issues may be tried by the express or implied consent of a party without being raised in pleadings or motions. Shipley v. Ferguson, 638 So.2d 1295, 1299-1300 (Miss.1994) (quoting M.R.C.P. 15(b)).
¶ 14. In the present case, it does not appear that this issue was tried by consent. Although testimony indicated that LaDonna and other adults had worked on the family property with Ruth and David, no claim was made by LaDonna or David that the adult children should be given some piece of the marital property. Even if some of the testimony could be interpreted as providing proof that the deed was conveyed to LaDonna by David as compensation for her efforts over the years, that testimony would go only toward the issue of whether the deed should have been set aside. No testimony was presented that should have led Ruth or the chancellor to believe that the equitable distribution of the property needed to include the interests of the adult children who had contributed time and work to the farm.
¶ 15. It is not enough that evidence was introduced which would have supported such a claim, had it been made. The issue, in some form, must have been presented before the chancellor and Ruth. See Alexander v. Womack, 857 So.2d 59, 62(¶ 13) (Miss.2003). We note specifically that prior cases that have found that certain issues were tried by consent are all factually different from the present case. In Weiss v. Weiss, 579 So.2d 539, 542-43 (Miss. 1991), the Mississippi Supreme Court found that the issue of alimony had been tried by consent where the husband in a divorce action "put on evidence as to fault and alimony, failed to properly object, and failed to raise any due process considerations at trial or on appeal." In Stewart v. Graber, 754 So.2d 1281, 1284-85(¶ 17) (Miss.Ct.App.1999), this Court found that the issue of adverse possession was tried by consent where "considerable" evidence regarding adverse possession had been presented and the issue was "openly" argued during closing arguments. By contrast, in the present case, limited evidence was put on regarding the contributions of the adult children to the marital estate. No argument whatsoever was made indicating that the adult children should have been taken into account in dividing the marital estate. Therefore, we find that LaDonna and David are procedurally barred from raising this issue in their appeal.
¶ 16. We also note that, regardless of whether the issue is procedurally barred, it is clearly without merit. No case has been cited by LaDonna or David holding that adult children should be taken into account when determining an equitable distribution of the marital property. No *402 evidence was presented indicating that the family income sources (the church, school, trucks, etc.) had ever been part of a partnership or corporation, other than the candy business, which Ruth incorporated after David's incarceration. The evidence indicated, as the chancellor found, that all the money that was generated by the family's various enterprises made its way into David's pocket, and was, therefore, part of the marital estate.[5] In the absence of significant evidence produced by LaDonna or relevant case law cited, we find that the chancellor did not err in declining to spontaneously apportion part of the marital estate to the adult children.
¶ 17. We also note that the evidence presented at trial was such that the chancellor was not required to find that the deed was conveyed to LaDonna as a trust so that she could be rewarded for her work on the family property. Evidence introduced established that an earlier conveyance from David to Ruth contained special language that all parties understood meant that the deed was intended to go back to David upon his request. The same language was contained in the 2001 deed to LaDonna, and David testified that its inclusion was for the same purpose. Although LaDonna testified that she felt that she had control over the property, the chancellor rebuked her several times for looking to her father for answers to questions asked of her while on the stand. In fact, at one point in the proceedings, while LaDonna was under oath and testifying, David answered the question asked of her out loud. Under such circumstances, and with testimony from David indicating that the understanding of the conveyance was that LaDonna would transfer the property back to him as soon as he was out of jail, the chancellor did not abuse his discretion in finding that the conveyance to LaDonna should be set aside. We also note that the evidence was substantial that a fiduciary relationship existed between David and Ruth, and that the transfer was made only as the result of David's undue influence over Ruth in effecting the conveyance. The chancellor did not err in setting aside the conveyance.
2. Valuation of the Property
¶ 18. LaDonna and David allege that the chancellor erred in failing to properly value the marital property. Specifically, LaDonna and David contend that the chancellor erred in taking Ruth's valuation of the property at face value, and failing to inquire about any additional personal items that may have had value.
¶ 19. According to Rule 8.05 of the Uniform Chancery Court Rules, both parties to a divorce action must "provide the opposite party or counsel, if known, the following disclosures: (A) A detailed written statement of actual income and expenses and assets and liabilities. . . ." The rule also requires that a party file a statement concerning income tax returns and employment history. Unif. Ch. Ct. R. 8.05. A certificate of compliance is supposed to be filed with the disclosures. Id. In the present case, only Ruth attempted to meet these disclosures, and her attorney filed a certificate of compliance as required by the rule. By contrast, no documents *403 were presented by David indicating his assets and liabilities, or attempting to place any valuation whatsoever on the marital property.
¶ 20. It is the responsibility of a chancellor in a divorce proceeding to make an adequate investigation into the value of the marital property that is being divided: "Property division should be based upon a determination of fair market value of the assets, and these valuations should be the initial step before determining division. Therefore, expert testimony may be essential to establish valuation sufficient to equitably divide property." Ferguson v. Ferguson, 639 So.2d 921, 929 (Miss.1994). In the present case, we note that the chancellor did not make a sufficient evaluation of the value of the marital assets. The $200,000 figure used by the chancellor was a number given by Ruth without any explanation or supporting documentation. Terry King, Ruth and David's adult son, testified in passing that the property was worth half a million dollars. Therefore, under other circumstances, we would find the chancellor's valuation of the property inadequate and insufficiently supported by evidence.
¶ 21. However, we decline to reverse the findings of the chancellor in the present case because David and LaDonna failed to provide any estimate regarding the value of the marital estate, nor was any objection lodged to Ruth's valuation of the property. Although testimony indicated that there was additional personal property that had not been taken into account in Ruth's Rule 8.05 disclosure, no effort was made by either party to illuminate the value of that additional property.[6] As we stated in Dunaway v. Dunaway, 749 So.2d 1112, 1121(¶ 28) (Miss.Ct.App.1999):
It is our conclusion that the chancellor, faced with proof from both parties that was something less than ideal, made valuation judgments that find some evidentiary support in the record. To the extent that the evidence on which the chancellor based his opinion was less informative than it could have been, we lay that at the feet of the litigants and not the chancellor.
The circumstances are nearly identical in the present case. Faced with proof that was far less than ideal, the chancellor made a valuation of the marital estate that finds some support in the record. In the absence of any evidence on David's behalf as to the value of the property, we decline to find that the chancellor abused his discretion in determining the value of the property to be $200,000 and the value of personal property to be around $100,000, as both figures were presented to the court in Ruth's Rule 8.05 estimation of the value of the real and personal marital property. David failed to comply with the terms and conditions of Rule 8.05. Since he did not comply with the requirement of the rules or offer other credible evidence of the value of the property, we decline to put the chancellor in error.
3. Distribution of Estate to Ruth
¶ 22. In their final contention of error, David and LaDonna claim that the chancellor erred when he awarded Ruth the entire marital estate, largely due to the substantial amount of money that had been spent on David's criminal defense. LaDonna and David erroneously claim that the chancellor made this distribution "all because the husband was overbearing and *404 controlling and his conduct led to the divorce."
¶ 23. In his bench opinion, the chancellor indicated that he was awarding Ruth all the marital estate, which came to just over half of the marital assets, because
this is a fair and equitable distribution of the marital assets, especially considering David Earl King and his inappropriate and illegal actions are the cause of the family's financial and legal problems. It's certainly fair and equitable that Ruth King receive a slightly larger distribution of the marital assets. Also the court notes that the assets being received by Ruth King are not liquid assets and that she is receiving assets that are basically the basic tools of life, a place to live and the buildings and tools to carry on that life with considerable effort on her part.
The chancellor noted that both David and Ruth had made substantial contributions to the marital estate. The chancellor also based his distribution on the fact that David is serving what will likely be a life sentence, and therefore "his need for financial security would seem to be essentially non-existent since he is a resident of the Department of Corrections and is cared for and provided for by that department." Additionally, the chancellor indicated that he was considering David's ill treatment of Ruth for the years they were married. In other words, David's control over and abuse of Ruth was only one of the factors that the chancellor addressed in determining an equitable distribution of the marital estate.
¶ 24. In short, it is clear that the chancellor in this case looked at many factors in making an equitable distribution of the marital property, as required by Ferguson and its progeny. Therefore, the chancellor did not abuse his discretion, and no error occurred. David and LaDonna's final contention of error is without merit.
¶ 25. THE JUDGMENT OF THE CHANCERY COURT OF WALTHALL COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.
NOTES
[1] David was eventually convicted of tax evasion and multiple counts of sexual battery. He has been sentenced to over sixty years in the custody of the Mississippi Department of Corrections. No pardon has been issued, and David's appeals have been denied. King v. State, 857 So.2d 702 (Miss.2003); King v. State, 897 So.2d 981 (Miss.Ct.App.2004).
[2] Testimony at the trial indicated that the family, at any given time, would include not only Ruth, David, and their children, but also numerous orphans that the family took in over the years.
[3] Ruth claims that she never returned to the bedroom because David would not let her. David testified that, around that time, Ruth confessed to him that she had been unfaithful and some of his children were not even his, and therefore he felt unclean, and would not allow her back in his bedroom. LaDonna testified that her mother stayed downstairs by choice and had access to David when Ruth wanted. Terry King, another child, testified that Ruth refused to return when David initially asked, and thereafter, David would not let Ruth return to the bedroom, although she asked many times.
[4] Nathan was convicted with David of sexual assault of a male child.
[5] LaDonna did indicate in her testimony that she and her husband maintained control of money that was theirs, and not their father's. However, the record also indicates that LaDonna looked to her father for her answers during her testimony, and substantial evidence was presented showing that David maintained control over every aspect of life and finances at the family property. Therefore, we defer to the chancellor's determination that all the money produced at the property ultimately made its way to David's pocket.
[6] Uniform Chancery Court Rules provide: "Unless excused by order of the court for good cause shown, each party in . . . domestic case[s] involving economic issues and/or property division" shall, among other things, provide a statement of assets which shall include the estimated value of the assets. UCCR 8.05.