[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 162 
Jerry Lee Yohey ("the husband") appeals from a judgment divorcing him from Carolyn Ann Yohey ("the wife"). He argues that the trial court abused its discretion by awarding the wife what, he says, equals 86 percent of the marital property and periodic alimony amounting to what, he claims, is 83 percent of his net income.
The parties were divorced in 2002 after a 20-year marriage. Each had been married once before, and each had adult children from their prior marriage. No children were born of this marriage. At the time of trial, the husband was 65 years old and the wife was 60 years old. With the exception of the wife's high blood pressure, each of the parties is in good health. The husband has a bachelor's degree in mechanical engineering from Purdue University and a master's degree in business administration from the University of Michigan. He is licensed as a certified public accountant in Michigan and Georgia. In 1980, the husband, who was earning $140,000 annually as a partner in the accounting firm of Ernst Whinney in Atlanta, Georgia, was appointed by the firm as the regional director of management consulting for the southeast region. The parties married in 1982 and lived in the Atlanta area for the first six years of their marriage. In 1988, the husband, whose annual salary was then $265,000, left Ernst Whinney and purchased a Precision Tune franchise, an automobile service business, in Madison County, Alabama. The parties moved to Huntsville, and the husband eventually bought a second Precision Tune franchise in the area.
At the time of the trial in this case, the husband had sold both Precision Tune franchises. Following the sale of the first franchise, the husband was named as a defendant in a lawsuit concerning the lease of the building in which the franchise was operated. The husband testified that he has a $54,500 contingent liability arising out of that litigation.
The husband sold the second Precision Tune franchise for $100,000 to a Mr. and Mrs. Parker, who retained him as a financial consultant to "do the company books" for $500 per month. The husband testified that Mr. Parker died, whereupon Mrs. Parker terminated his consulting contract and failed to pay him $65,000 of the purchase price for the franchise. The husband characterized the balance due on the sale as a contingent asset.
The wife has a high-school diploma. After the parties moved to Huntsville, the wife's adult daughter and three-year-old grandson lived with them. During the marriage, the wife worked outside the home for only three or four months, during which time she provided part-time uncompensated clerical assistance at the Precision Tune franchises. The husband handled all of the parties' financial matters, including paying the bills, handling investments, and conducting retirement planning. At trial, the husband acknowledged that the wife has few marketable skills, little or no earning potential, and is "totally financially dependent" on him.
The wife testified that she believed that the parties had a good marriage until 2001, when she noticed that the husband was spending an inordinate amount of time on the computer in his study. She said that he spent basically the whole day in the study, coming out only for meals. The wife thought the husband was doing accounting work until, one day in April 2001, *Page 163 
while she was searching the Internet for information concerning a proposed trip to Disney World, she discovered erotic electronic-mail messages and nude photographs that the husband had sent to and received from numerous women via the Internet.
At trial, the husband identified a set of handwritten notes that he had compiled; those notes identified the screen names, physical descriptions, and sexual preferences of "over a hundred" women with whom he had engaged in "cybersex" relationships. The husband admitted that he had had a sexual affair with a woman he had met in an Internet "chat room." The husband's sexual encounters with this woman had occurred in Dallas, Texas; Huntsville, Alabama; and at the parties' condominium in Orange Beach, Alabama. The husband acknowledged that the wife loved him "very deeply" and that he had violated a pact the parties had made at the time of their marriage to be faithful to each other.
The trial of this case began on July 10, 2002. The husband admitted that, despite the existence of a standing pendente lite order restraining him from expending any moneys other than for customary living expenses, he had withdrawn $89,000 from his individual retirement accounts ("IRAs") since March 2002. He stated that he had used those funds to pay off a $16,000 note to Regions Bank, to pay estimated taxes and past-due taxes, to pay approximately $3,000 per month in living expenses for himself, and to pay $1,300 per month in pendente lite support to the wife. The husband explained that he had not filed income-tax returns for the years 1999, 2000, and 2001.
At trial, the husband's financial expert testified that 52.44 percent of the funds in the husband's IRAs had been accumulated during the parties' marriage and were, therefore, marital property; the trial court accepted that figure in making its property division. Apparently, the trial court also found that a parcel of real estate — an undeveloped lot on Lake Charlevoix in East Jordan, Michigan, that the husband had purchased before the marriage — was the husband's separate property.
The trial court divorced the parties on the ground of the husband's adultery, specifically noting that it "consider[ed] the conduct of the parties with reference to the cause of the divorce to be a particularly significant factor in its determination as to alimony and the division of property." The court entered a judgment that awarded the wife $1,600 per month in periodic alimony, divided the marital assets and debts, and awarded the wife an attorney fee of $13,775. The trial court ordered that the marital residence, which was valued at $180,000 and was subject to a mortgage of $112,100, be sold; the court directed that the wife receive 75 percent of the net proceeds from the sale. It awarded the wife the parties' Orange Beach condominium, which the parties agreed had a fair market value of $343,000, including all furniture, furnishings, and contents, and made the wife responsible for the existing first mortgage indebtedness of $151,600. It also awarded the wife $222,500 from the husband's IRAs; her IRA in the amount of $16,500; the bank accounts in her name; one-half of any tax refunds due to the parties upon the filing of joint tax returns; and one-half of any sums received from the sale of the Precision Tune franchise to the Parkers. The court awarded the wife an equitable share of the contents of the marital home; a 1993 Plymouth Acclaim automobile; and her personal property, clothing, and jewelry.[1] The court ordered the *Page 164 
wife to be responsible for any debts, including $6,000 of credit-card indebtedness, that she had incurred in her name alone.
The court awarded the husband 25 percent of the net proceeds from the sale of the marital residence; an equitable portion of the contents of the marital home; the bank accounts in the husband's name; three vehicles — a 1981 Cadillac, a 1973 truck, and a Honda Accord;[2] the remainder of the marital portion of the husband's IRAs not awarded to the wife, totalling $245,671; one-half of any tax refunds due the parties; one-half of any sums received from the sale of the Precision Tune franchise to the Parkers; and the Lake Charlevoix property in Michigan, valued at $300,000. The husband was also ordered to maintain his existing life insurance policies with the wife as the beneficiary.
The trial court made the husband responsible for the following debts and liabilities: the mortgage indebtedness on the marital home pending its sale; any judgment arising out of the lawsuit concerning the leased premises for the first Precision Tune franchise; any tax liability of the parties, including delinquent taxes and penalties arising out of the husband's failure to file income-tax returns for three years; indebtedness to the husband's parents in the amount of $13,500; and credit-card indebtedness in the amount of $12,000.
 I.
The husband argues that the trial court abused its discretion by awarding the wife what, he says, equals 86 percent of the marital property. Initially, we note that there is no rigid standard or mathematical formula on which a trial court must base its determination of alimony and the division of marital assets.See Slater v. Slater, 587 So.2d 376 (Ala.Civ.App. 1991). Seealso Jenkins v. Jenkins, 781 So.2d 986 (Ala.Civ.App. 2000) (holding that, in light of the wife's admission of adultery and husband's testimony that continuation of his business depended on sufficient assets to maintain the bonding capacity of his construction company, the evidence supported a property division awarding the husband 72 percent and the wife 28 percent of the marital assets after a 34-year marriage).
A trial court is free to consider the facts and circumstances unique to each individual case in fashioning an award. Brewer v.Brewer, 695 So.2d 1 (Ala.Civ.App. 1996). The only limitation on the trial court's broad discretion in dividing the marital estate is that the property division must be equitable under the circumstances of the particular case; the task of determining what is equitable falls to the trial court. Cantrell v.Cantrell, 773 So.2d 487 (Ala.Civ.App. 2000). A trial court's determination as to alimony and the division of property following an ore tenus presentation of the evidence is presumed correct. See Parrish v. Parrish, 617 So.2d 1036, 1038
(Ala.Civ.App. 1993). "This presumption of correctness is based on the trial court's being in the unique position of being able to observe the witnesses and to assess their demeanor and credibility. Hall v. Mazzone, 486 So.2d 408 (Ala. 1986)."Walls v. Walls, 860 So.2d 352, 357 (Ala.Civ.App. 2003).
 "A division of marital property in a divorce case does not have to be equal, only equitable, and a determination of what is equitable rests within the sound discretion of the trial court. When dividing marital property, a trial court should consider several factors, including the length of the marriage; the age and health of the parties; the future *Page 165 
prospects of the parties; the source, type, and value of the property; the standard of living to which the parties have become accustomed during the marriage; and the fault of the parties contributing to the breakup of the marriage."
Golden v. Golden, 681 So.2d 605, 608 (Ala.Civ.App. 1996) (citation omitted).
The trial court's judgment reflects that the court carefully considered the evidence and employed the relevant factors in making its property division. Considering the husband's admission of adultery as well as his acknowledgment that the wife loved him "very deeply," that the wife was totally dependent upon the husband financially, that the wife's earning capacity was weak, and that the wife's future prospects were poor, we cannot hold the trial court in error for reaching the same conclusions and tailoring its division of the marital assets accordingly. It is evident that the husband's gross marital misconduct played a large part in the trial court's division of the marital assets. The trial court specifically stated in its judgment that it "consider [ed] the conduct of the parties with reference to the cause of the divorce to be a particularly significant factor in its determination as to alimony and the division of property." (Emphasis added.)
Notwithstanding the trial court's specific finding of fault on the part of the husband and its granting the divorce on the ground of adultery, it is nevertheless apparent that the trial court did not arbitrarily favor the wife in dividing the parties' assets. For instance, the trial court treated the Michigan lakefront lot valued at $300,000 as the husband's separate property despite the fact that it was at least arguable that the lot could have been deemed marital property. The testimony was undisputed that the parties had planned to build their future vacation/retirement home on the lot. In preparation for construction, they had hired an architect, arranged for percolation tests on the soil, and begun foundation work on a residence. Compare T.K.T. v. F.P.T., 716 So.2d 1235, 1240
(Ala.Civ.App. 1998) (affirming an award of farm property to the wife, despite the husband's claim that the farm was his separate estate, because, among other reasons, the parties had listed the farm as an asset on their joint financial statement and "had planned to use the farm as their retirement home").
The trial court's roughly equal division of the parties' largest marital asset — the husband's IRAs — also indicates the fairness of its judgment to the husband. Section 5(g) of the judgment states:
 "The sum of two hundred twenty-two thousand five hundred and no/100 ($225,500.00) dollars to be transferred by way of Qualified Domestic Relations Order from retirement funds presently held in the name of [the husband].¹ Eighty-two thousand nine hundred fifty and no/100 ($82,950.00) dollars shall be transferred to [the wife] from the Roth IRA account with Fidelity Investments in the name of [the husband]. The balance remaining, one hundred thirty-nine thousand three hundred and no/100 ($139,300.00) dollars, shall be transferred to [the wife] from funds maintained in the [husband's] name in the Fidelity `roll over' IRA.
 ". . . It is the intent of the Court that the division to be made shall be of the existing holdings and investments contained in such accounts, whether it be in cash and/or securities, so that each party shall after said division possess in his or her respective name an equal amount and nature of retirement assets.
"________________ *Page 166 
 ¹ In determining this figure, the Court has computed one-half (1/2) of the total `marital' IRA contributions of the parties as set forth in the Financial Statement of [the husband] prepared by George Henry, CPA. One-half (1/2) of the marital property IRA's minus $16,500 (the Wife's existing IRA) equals $202,250.00 The Court has added an additional $20,000.00 to this sum representing approximately 22% of the funds removed by the [husband] from the retirement accounts on or about March 2002 through the date of trial. Although some of these funds were allocated to back taxes, the [husband] testified some funds were used for living expenses and neither he nor his accountant could quantify the penalties and interest due on taxes as a consequence of this failure to timely make tax payments and file returns. Accordingly, the Court finds this additional sum to be equitable as the [husband] reduced marital properties by a considerable sum notwithstanding pending orders which at a minimum would have required notice to the [wife] of his intent to remove those funds."
Finally, we do not accept the husband's characterization of the property division as an award of 86 percent of the marital estate to the wife. At trial, the value of, and the indebtedness on, various items of marital property were disputed. The personal financial statements submitted by the parties differed in significant respects. Based on the evidence, the trial court could have concluded that the values for the marital property suggested by the wife were more accurate than those suggested by the husband. The wife's valuations reflected that the trial court's judgment awarded her 65 percent, and the husband 35 percent, of the marital estate:
Assets to Wife Value
 Checking account 1,000 Wife's IRA 16,500 Marital home (75% of equity of $67,900) 50,925 Equity in Orange Beach condominium 191,400 Husband's IRAs 222,500 _______ Total to Wife ......................... $ 482,325 (65%)
Assets to Husband Value
 Checking account 1,000 Husband's IRAs 245,671 Marital home (25% of equity of $67,900) 16,975 _______ Total to Husband ...................... $ 263,646 (35%)
The husband takes issue with the trial court's equally dividing a contingent asset of the parties (one-half of any sums received from the sale of the Precision Tune franchise to the Parkers) while assigning to him the entire responsibility for a contingent liability of the parties (any judgment arising out of the lawsuit concerning the leased premises for the first Precision Tune franchise). We find no error. In Mosley v. Mosley,747 So.2d 894 (Ala.Civ.App. 1999), this court indicated that "contingent assets and contingent liabilities are not included in the computation of the parties' net worth, but are assessed (and divided) separately from other marital `property.'" 747 So.2d at 901 (citing Amendments to Florida Family Law Rules,713 So.2d 1, 31 (Fla. 1998)). It was within the trial court's discretion to divide the contingent assets equally but to assign sole responsibility for the contingent liability to the husband. SeeMosley v. Mosley, supra. See generally McClelland v.McClelland, 841 So.2d 1264 (Ala.Civ.App. 2002). *Page 167 
The husband's appellate brief characterizes the trial court's division of the marital liabilities as inequitable because, he argues, the judgment assigns the husband responsibility for $184,633, or 54 percent, and the wife $156,900, or 46 percent, of the marital debts. The husband's calculation is flawed, however, because it ascribes to the husband the entire responsibility for the mortgage indebtedness of $112,100 on the marital residence. Instead, the trial court ordered the residence to be sold, required the husband to pay the mortgage pending a sale, and directed the parties to divide the net proceeds. Therefore, the wife will share responsibility for a portion of the mortgage indebtedness.
After reviewing the record, we cannot conclude that the trial court's division of marital assets was inequitable or that its property division was plainly and palpably wrong. We hold that the trial court did not exceed the limits of its discretion in its division of the marital property. See Ex parte Moore,873 So.2d 1161 (Ala. 2003).
 II.
The husband testified that his income consisted of $1,208 per month in Social Security benefits and $710 per month in Ernst 
Whinney pension benefits. He contends that the trial court abused its discretion in awarding the wife $1,600 per month in periodic alimony when, he claims, his monthly income is only $1,918.
Citing Smith v. Smith, 866 So.2d 588 (Ala.Civ.App. 2003), the husband argues that the trial court could not consider his IRAs as a source of income from which to pay periodic alimony. InSmith, the main opinion held that "periodic alimony must be payable from current income." 866 So.2d at 591. The husband inSmith was 43 years old, was not retired, and had no plans to retire in the near future. We determined that the trial court could not consider a retirement account from which the husband was not currently drawing any benefits as a source of income from which to pay periodic alimony. The present case is readily distinguishable from Smith. The husband here is 65 years old and unemployed. He was formerly a certified public accountant who retired from his accounting practice and bought two automobile service franchises. He later sold both franchises and was retained in one of them as a financial consultant. At the time of trial, he had been dismissed from his consulting job and was unemployed. His monthly expenses in the year preceding trial were more than $5,000. He has three IRAs that he has carefully managed, rolling over a traditional IRA containing $440,000 to a Roth IRA in order to take advantage of certain tax benefits allowed pursuant to 26 U.S.C. § 408A. Qualified distributions from his IRAs are not, after the age of 59 1/2, included in gross income. Id. At trial, the husband testified that during the 14 months the parties were separated and awaiting trial, he paid the $1,100 monthly mortgage payment on the marital residence, the $1,300 monthly pendente lite support payment to the wife, and his own personal monthly living expenses totalling $3,915.[3]
The husband's accountant submitted a financial statement, dated October 18, 2002, indicating that the husband's total net worth was $1,640,000; of that amount, the husband's IRAs accounted for $798,500.[4] *Page 168 
The husband appeared to contend at trial that his IRA withdrawals were for emergency needs, such as for paying off bank notes and past-due taxes, implying that he did not contemplate taking postdivorce distributions from his IRAs. Based on the evidence, the trial court was entitled to disbelieve the husband's testimony that his monthly income was only $1,918 and to conclude that, unlike in Smith, the husband was currently drawing benefits from and regularly relying on his retirement accounts as "income." The trial court was authorized to conclude that the 65-year-old husband intended either not to work again or to find only limited employment, depending instead on distributions from his sizeable IRAs to meet his living expenses.
The purpose of periodic alimony is to support the former dependent spouse and to enable that spouse, to the extent possible, to maintain the status that the parties enjoyed during the marriage, until the spouse is self-supporting or maintaining a lifestyle similar to the one enjoyed during the marriage.O'Neal v. O'Neal, 678 So.2d 161, 164 (Ala.Civ.App. 1996). An appellate court will not reverse an award of periodic alimony unless it is unsupported by the evidence and amounts to an abuse of discretion. Ex parte Drummond, 785 So.2d 358 (Ala. 2000). All of the factors relevant to determining the division of marital assets, including "the length of the marriage; the age and health of the parties; the future prospects of the parties; the source, type, and value of the property; the standard of living to which the parties have become accustomed during the marriage; and the fault of the parties contributing to the breakup of the marriage," Golden v. Golden, 681 So.2d at 608, are equally relevant in determining the propriety of a periodic-alimony award. We hold that the trial court did not exceed the limits of its discretion in awarding the wife $1,600 per month in periodic alimony.
The wife is awarded an attorney fee on appeal in the amount of $3,750.
The judgment of the trial court is affirmed.
AFFIRMED.
YATES, P.J., and THOMPSON, PITTMAN, and MURDOCK, JJ., concur.
[1] The record does not disclose the value of these assets.
[2] The record does not disclose the value of these vehicles.
[3] The husband's monthly expenses included the $1,100 mortgage payment on the marital residence, but they did not include the $1,300 pendente lite support payment to the wife.
[4] This figure is exclusive of the withdrawals from March 2002 to the date of trial, which amounted to $89,000.