PITTMAN, Judge.
Roger D. Sherrill (“the husband”) appeals from a judgment of the Limestone Circuit Court divorcing him from Selina Kay Sherrill (“the wife”), dividing the parties’ assets and liabilities, ordering him to pay the wife periodic alimony, finding him in contempt for willful violations of four provisions of the trial court’s pendente lite order, and ordering him to pay the wife an attorney’s fee.

Factual and Procedural Background

In September 2009, the parties separated after 25 years of marriage. The wife filed a complaint for a divorce, alleging that the husband had been physically, emotionally, and verbally abusive. The husband counterclaimed, also seeking a divorce and alleging that the wife had committed adultery. Both parties moved for pendente lite relief; the wife sought spousal support and the husband sought, among other things, possession of the marital home. The evidence presented at a hearing in October 2009 indicated that the wife had been self-employed as a hairdresser for the last 15 years of the marriage and that the husband had worked the third shift as an hourly employee at Navistar Diesel of Alabama for the last 5 years of the marriage. Two years before they separated, the parties purchased a 100-year-old historic building in Anderson. The wife’s beauty salon, known as “Anderson Family Hair Care,” was located in one room of the historic building; the other rooms in the building were designated as “Country Porch Antiques” and were used to display antique furniture and furnishings for sale. The premises also included a detached garage and a garage apartment in which the parties’ adult son lived.
The parties jointly owned the antique store; the wife was the sole owner of the beauty salon. The parties maintained a joint checking account for household expenses; they had separate checking accounts and separate cash registers for each business. The wife paid overhead expenses of $800 per month for the beauty salon and contributed $200 per week toward the overhead expenses of the antique store. The wife’s net income from the beauty salon was approximately $400 per month, of which, she said, she had received $40 to $60 per week in cash payments and the remainder in checks from her customers. She testified that she had always deposited customers’ checks in her checking account; she had not, however, deposited the cash payments but had used them to pay for incidental expenses. The evidence indicated that the husband’s net income in 2008 was approximately $60,000.
Following the hearing, the trial court entered a pendente lite order requiring the husband to pay all family indebtedness that he had previously been paying; ordering the husband to pay the wife $500 per month in spousal support “due to the disparity in income of the parties”; awarding the husband temporary possession of the marital home; prohibiting each party from harassing or intimidating the other; ordering that the antique store be closed; and prohibiting the parties from selling, removing, transferring, or concealing the store’s inventory and assets. After the entry of the pendente lite order, the wife moved her beauty salon to a different loca *1226 tion for which she paid rent of $250 per month.
In January 2010, the husband moved to terminate his pendente lite alimony obligation, alleging that he had experienced a significant reduction in income as a consequence of his employer’s having lost contracts. The husband asserted that he was no longer receiving overtime or bonuses and that his gross annual wages were $47,985.60 (resulting, he said, in a net monthly income of $3,460.63, which income did not allow him to meet his monthly expenses of $4,327.56). In March 2010, the wife moved the trial court to find the husband in contempt for violating that portion of the pendente lite order that enjoined the parties from harassing, threatening, or intimidating each other. The wife attached to her motion a letter allegedly written to her by the husband, in which the husband called her a “white trash whore” and suggested that she commit suicide. In May 2010, the wife moved the trial court to place in escrow $24,000, the existing cash value of the parties’ life-insurance policies that the husband had obtained from Tennessee Farmer’s Insurance Company. The trial court deferred ruling on the three motions.
The case was tried over two days in November 2010. At that time, the husband was 50 years old and the wife was 45 years old. The wife testified that she had left the marital residence in August 2009, following an argument with the husband during which he had accused her of adultery, had lifted the mattress on which she was sleeping, and had “dumped” her on the floor. The wife stated that she had been afraid of the husband and had climbed out the bedroom window to escape from him.
After the parties’ separation, the wife lived with her sister and brother-in-law, who resided on the street where the marital residence was located. Between the sister’s house and the marital residence was a lot on which a mobile home had been placed. The husband testified that, during the six-month period preceding the parties’ separation, the wife had spent virtually every weekend night away from home and, he concluded, was having an affair with the man who lived in the mobile home on the lot between the marital residence and the residence of the wife’s sister. The wife denied that she had been having an affair. She stated that when she had spent the night away from home she had been with her female cousin, a graphic artist in Florence, working on a scrapbook for the parties’ granddaughter. According to the wife, she and her cousin had been engaged in “scrapbooking” until late at night, and the wife had sometimes decided to spend the night with her cousin in Florence rather than drive back to Anderson in the early hours of the morning. The wife testified that the husband was jealous and possessive, that he did not like the fact that she enjoyed spending time with anyone other than him, and that he had often hidden her keys so that she could not leave the marital home.
The evidence established that the parties had purchased the historic building in which the antique store was located for $105,000, that they had made a $25,000 down payment on that purchase, and that the building was encumbered by mortgage indebtedness of $74,000. The wife testified that the down payment had come from the parties’ joint checking account. The husband insisted that he alone had provided the funds for the down payment; he said the funds had come from the sale of stock that had been a gift from his mother in 1995. The parties agreed that the historic building was still valued at $105,000 at the time of trial. They also agreed that the marital home was worth $147,500 and *1227 was subject to a debt from a $30,000 home-equity line of credit. The husband acknowledged that, during the pendency of the action and without the wife’s knowledge or consent, he had obtained both the home-equity line of credit on the marital residence[1] and the existing cash value of the parties’ life-insurance policies. The husband testified that he had used those funds to pay off the existing mortgage indebtedness on the marital residence, to pay off the indebtedness on his truck, to pay other bills, and to purchase a “four-wheeler.”
The wife testified that she had worked longer hours and earned more income in 2010 after the parties had separated. The parties’ joint federal income-tax return for 2008 reflected that the wife’s beauty salon had gross receipts of $14,891. The wife’s individual federal income-tax return for 2009, however, reflected that the beauty salon had gross receipts of $25,312. The wife testified that she was currently earning a gross income of approximately $2,380 per month, from which she paid $850 per month in business expenses. She submitted no evidence of her personal living expenses.
The husband testified that, after the parties’ separation, he had realized that the wife had been underreporting her income since 2007. He explained that he had obtained the wife’s beauty-salon appointment book for 2007; that he had compared the appointments with the wife’s price list for various services offered by the salon (which information he had obtained in discovery, e.g., $10 for a man’s haircut, $12 for a woman’s haircut, $35 for “color,” and $75 for “foils”); and that he had assigned a value for each of the wife’s appointments in 2007. The husband testified that the grand total of gross receipts that the wife would have received in 2007 based on her appointment book was $49,093. Based upon the wife’s testimony that she had earned more in 2009 than she had earned in either 2007 or 2008, the husband concluded that the wife was currently earning more than he was earning and that she was, therefore, not entitled to alimony.
When the husband’s counsel moved to admit the appointment book and the husband’s notations into evidence, the wife’s counsel objected on the ground that the husband’s extrapolations were speculative:
“We don’t have a problem with the book. The book speaks for itself, but [it] doesn’t tell you the services rendered or what was actually done or who even showed up.”
The trial court then posed a question to the husband:
“THE COURT: Let me ask this question of the witness. In other words, I’m looking at May the 3rd, Thursday, and I’m seeing at 9:00 [Customer A] is coming in. At 9:30, [Customer B] is coming in. How do we know how much money [Customer A and B] spent? ... In other words, how do you know what service [Customer A] was rendered?”
The following then occurred:
“THE WITNESS: If [Customer A] was a regular customer, ... you would go back until you would find what [the wife] had done for [Customer A in the past], because a lot of it, she had regular customers come every Friday or every other Friday or every Wednesday, every other Wednesday.
“THE COURT: So what I hear you to be saying is you have gone back on [Customer A] and you have found at *1228 some point in time ... some [description] of what [the wife] did for [Customer A] and you’re extrapolating that to determine that [Customer A] got that exact service every time?
“THE WITNESS: Right.”
The husband also took issue with the wife’s testimony that, in addition to payments by check from her customers, she had also regularly received between $40 and $60 per week in cash payments. The husband testified, without any supporting documentation, that the wife had actually received over $150 per week in cash payments. When asked by the wife’s counsel whether, after having come to the realization that the parties’ incomes had been underreported on their joint returns in 2007 and 2008, the husband had sought to file amended tax returns, the husband answered in the negative, stating that the wife had given him “the numbers” for her business and that he had reported those numbers to the parties’ accountant, but that he did not know anything about the wife’s business.
The husband’s federal income-tax returns reflect gross income for him in the following amounts: $60,817 in 2007; $63,003 in 2008; and $68,917 in 2009. The husband submitted a pay stub from his employer that reflected year-to-date gross pay as of October 31, 2010, of $46,226, or gross monthly income of $4,622 (which amount, he said, was equivalent to a net monthly income of $3,460.63, and represented a reduction in net income of $1,200 per month from the previous year). The husband stated that his monthly expenses totaled approximately $4,327.56, which included the following: $900 for food; approximately $697 for the mortgage payment on the historic building; $600 for payments to “Wal-mart”; $500 for periodic alimony; $93 for the home-equity line of credit for the marital residence; and payments on three credit cards, and for utilities, satellite television, insurance, and pest control. When questioned about the “food” expense, the husband explained that he did not cook and that he ate out three meals a day, seven days a week. When asked about the “Wal-mart” expense, the husband stated that he had bought “whatever [he] need[ed]” at that store.
Each party accused the other of removing inventory from the antique store and disposing of it. The wife stated that she had taken photographs of the contents of the store before the pendente lite order had been entered in October 2009 and that she had compared those photographs with the inventory that remained at the time of trial. She concluded that the husband had disposed of approximately $20,000 worth of inventory. The husband acknowledged that he had sold several items of inventory to pay bills, but, he said, he had seen the wife loading a truck with furniture from the antique store before she had filed her divorce complaint.
The trial court divorced the parties on the ground of incompatibility and divided the parties’ assets and liabilities as follows. The wife was awarded the marital residence and ordered to pay the $30,000 indebtedness associated therewith; the husband was awarded the historic building in which the parties had operated their businesses and ordered either to pay the $74,000 mortgage indebtedness thereon, to refinance the mortgage in his own name within 45 days, or to sell the property. The husband was awarded the inventory of the antique store valued at $53,154, and the wife was awarded an interest therein; the husband was ordered to pay the wife $20,000 for her share of the equity in the inventory. The wife was awarded $18,364, representing half the value of the husband’s T. Rowe Price retirement account; the husband was *1229 awarded a separate investment account containing $23,126.32; and the wife was awarded her Morgan Stanley investment account containing $10,603. The wife was awarded the vehicle in her possession; the husband was awarded the three vehicles in his possession and made responsible for any indebtedness thereon. The husband was ordered to pay the $900 balance on the parties’ Sam’s Club credit card, which he had used to purchase a computer, a printer, and a fax machine for himself. He was also ordered to pay the $2,000 balance on the parties’ Discover credit card that he alone had been using for the past few years and for which he had been making only the minimum payments. The trial court also ordered the husband to pay the wife $500 per month in periodic alimony and to continue the wife’s medical and health-insurance coverage for the time allowed by the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. §§ 1161-1169.

Standard of Review

“When the trial court fashions a property division following the presentation of ore tenus evidence, its judgment as to that evidence is presumed correct on appeal and will not be reversed absent a showing that the trial court exceeded its discretion or that its decision is plainly and palpably wrong. Roberts v. Roberts, 802 So.2d 230, 235 (Ala.Civ.App.2001); Parrish v. Parrish, 617 So.2d 1036, 1038 (Ala.Civ.App.1993); and Hall v. Mazzone, 486 So.2d 408, 410 (Ala.1986). A property division is required to be equitable, not equal, and a determination of what is equitable rests within the broad discretion of the trial court. Parrish, 617 So.2d at 1038. In fashioning a property division and an award of alimony, the trial court must consider factors such as the earning capacities of the parties; their future prospects; their ages, health, and station in life; the length of the parties’ marriage; and the source, value, and type of marital property. Robinson v. Robinson, 795 So.2d 729, 734 (Ala.Civ.App.2001). ‘[W]e note that there is no rigid standard or mathematical formula on which a trial court must base its determination of alimony and the division of marital assets.’ Yohey v. Yohey, 890 So.2d 160, 164 (Ala.Civ.App.2004).”
Stone v. Stone, 26 So.3d 1232, 1236 (Ala.Civ.App.2009).

I. Periodic Alimony

The husband argues that the trial court erred in awarding the wife periodic alimony because, he says, the wife was self-supporting and earning a greater income than he was earning at the time of trial. In the alternative, he contends that the evidence established that he did not have the financial ability to pay the wife periodic alimony.
The trial court was free to accord little or no weight to the husband’s assessment of the wife’s income based on his extrapolations from her salon appointment book. The court was also authorized to find that some of the husband’s monthly living expenses were, if not unbelievable, at least improvident and ill-advised under the circumstances.
“‘“It was within the province of the trial court to consider the credibility of the witnesses, to draw reasonable inferences from their testimony and from the documentary evidence introduced at trial, and to assign such weight to various aspects of the evidence as it reasonably may have deemed appropriate.... In order to reverse the trial court ..., we would have to make our own credibility determinations and we would have to reweigh the evidence, neither of which we are allowed to do.” ’ ”
*1230 Faellaci v. Faellaci, [Ms. 2100752, May 4, 2012] 98 So.3d 521, 536 (Ala.Civ.App.2012) (quoting Vestlake Cmtys. Prop. Owners’ Ass’n v. Moon, 86 So.3d 359, 367 (Ala.Civ.App.2011), quoting in turn Miller v. Associated Gulf Land Corp., 941 So.2d 982, 990 (Ala.Civ.App.2005)). The trial court was presented with evidence indicating that, even after the husband’s reduction in pay, his monthly gross income of $4,622 was almost twice the wife’s monthly gross income of $2,380 — an amount from which, the wife said, she paid $850 per month in business expenses. Notably, the wife did not present any evidence of her personal living expenses, perhaps because she had been living with her sister during the pen-dency of the divorce action. Nevertheless, the trial court heard evidence from which it could reasonably have determined that, once the wife began to live in the marital residence again after the divorce, she would not be able to pay customary living expenses on the income she was earning.

II. Division of Marital Assets and Liabilities

The husband contends that the trial court’s property division is inequitable because, he says, the wife was awarded a disproportionate share of the assets that were subject to division. He contends that the wife’s share was approximately 75% and that his share was approximately 25%.
We cannot say that the property division is inequitable. Each party was awarded one real-property asset and was allocated its associated indebtedness. Each party was awarded one investment account; the wife was awarded half of the husband’s retirement account. Each party was awarded the vehicles in his or her possession. The husband was ordered to pay credit-card debts for purchases he alone had made. The wife requested that the husband be awarded all the inventory of the antique store, but that she, as a joint owner of the store, be awarded half the value of the inventory. The trial court awarded her $20,000 (less than half of $53,154, the value of the inventory), thus implicitly crediting her testimony that the husband had disposed of inventory worth $20,000 after the pendente lite order prohibiting the dissipation of assets.
The trial court was presented with evidence indicating that the husband’s conduct was the primary reason for the breakdown of the marriage, and it was authorized to consider that evidence in dividing the property. “‘Even where the parties are divorced on the grounds of incompatibility, the conduct of the parties and fault with regard to the breakdown of the marriage are factors for the trial court to consider in fashioning its property division.’” Ex parte Drummond, 785 So.2d 358, 363 (Ala.2000) (quoting Myrick v. Myrick, 714 So.2d 311, 315 (Ala.Civ.App.1998)). The wife presented evidence indicating that the husband had been obsessive about not paying for anything that did not directly benefit him. For example, when the wife testified that she wanted the court to award her the marital residence, she was asked whether she was capable of taking care of the 3.2-acre lot on which the residence was situated. She replied that she had been taking care of the yard for 25 years. The wife, an ovarian-cancer surviv- or, testified that the husband would not cut the grass, even during the time that she was undergoing chemotherapy, and, further, that he had “griped about the chemotherapy bills and cancer-surgery bills.” The wife stated that she had asked the husband “who he was going to blame his problems on when [she] was dead and gone and he said when [she] was dead and gone he wouldn’t have any more problems.”
*1231 The wife testified that the husband had allowed her to use his credit card for the family shopping but that, when she returned from shopping, he routinely examined the receipts and marked the items for which he demanded reimbursement from the wife, even de minimis items such as diet soda for her and socks for the parties’ son. The wife testified that the husband had been violent in the past and that she was afraid of him. The evidence was undisputed that, during the pendency of the divorce action, the husband had been arrested for a domestic-violence offense against the parties’ son.[2]

III. Contempt and Attorney’s Fee

The trial court found the husband in contempt of four provisions of the pendente lite order. The divorce judgment states:
“This court finds that the husband willfully violated several provisions of the pendente lite order issued by this court on October 27, 2009. The husband violated provision (1) of said order by enclosing a typed and handwritten letter with his February spousal support payment in which he repeatedly referred to the wife as a ‘whore’ and encouraged her to commit suicide. Said letter was clearly intended for the purpose [of] harassing, threatening, and intimidating her. The husband violated provision (3) of said order by selling, assigning, transferring and removing items from the antique store. This court further finds that the husband violat[ed] provision (5) of said Order by refusing to pay the utility bill for the property located at 7700 Highway 207 in Anderson, Alabama, which was part of the family indebtedness that he previously paid. Finally, this Court finds that the husband is in violation of provision (4) by his failure to pay the -wife the sum of $500.00 per month in temporary spousal support for the month of December 2010. Therefore, it is Ordered that within forty-five (45) days after the entry of the final decree of divorce, the husband shall pay to the wife the sum of $10,000.00 for payment of the services rendered by her attorney in this case.”
The husband challenges the finding of contempt with respect to the violation of provision (4) of the pendente lite order: that he failed to pay the wife temporary spousal support for the month of December 2010. He argues that the trial court heard no evidence indicating that the husband had not paid his December 2010 support obligation. The husband is correct.
“The determination of whether a party is in contempt of court rests entirely within the sound discretion of the trial court, and, ‘ “absent an abuse of that discretion or unless the judgment of the trial court is unsupported by the evidence so as to be plainly and palpably wrong, this court will affirm.” ’ Gordon v. Gordon, 804 So.2d 241, 243 (Ala.Civ.App.2001) (quoting Stack v. Stack, 646 So.2d 51, 56 (AJa.Civ.App.1994)).”
Miller v. Miller, 47 So.3d 262, 264 (Ala.Civ.App.2009). This case was tried on two separate dates, November 16 and November 23, 2010. The wife testified on November 16 that the husband was “current” on all pendente lite alimony payments. Between that date and the entry of the divorce judgment on January 6, 2011, the trial court heard no further evidence regarding the husband’s payment of spousal support. Therefore, the trial court’s determination that the husband was in contempt of provision (4) is not supported by the evidence of record and is plainly and palpably wrong.

*1232
Conclusion

The judgment is affirmed in all respects except one. The finding that the husband was in contempt of provision (4) of the pendente lite order is reversed, and the cause is remanded with instructions to vacate that finding of contempt and to determine whether to amend the award of an attorney’s fee to the wife.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and BRYAN, THOMAS, and MOORE, JJ., concur.

. The wife acknowledged that she had signed "some papers” relating to the marital residence, but, she said, the husband had told her that she was signing a termite bond.

. The son later dropped the charges against the husband.