Rel: September 26, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2025

_____

## CL-2025-0072

_____

## W.D.G.

## v.

## K.S.G.

### Appeal from Marion Circuit Court
### (DR-23-900024)

FRIDY, Judge.

W.D.G. ("the husband") appeals from a judgment of the Marion Circuit Court ("the trial court") divorcing him from K.S.G. ("the wife"), dividing the marital property, and awarding the wife alimony in gross in

the amount of $200,000. For the reasons discussed herein, we affirm the judgment in part and reverse it in part.

Background

This is the second time the parties have come before this court in connection with the division of marital property in this case. In W.D.G. v. K.S.G., [Ms. CL-2024-0223, Nov. 15, 2024] ___ So. 3d ___ (Ala. 2024), this court reversed in part the original divorce judgment after determining that the trial court had improperly awarded the wife more than 50% of the value of the husband's retirement accounts, in violation of § 30-2-51(b)(2), Ala. Code 1975. We remanded the case for the trial court to "'reconsider the equities and to make an equitable division of the parties' property.'" ___ So. 3d at ___ (quoting Stover v. Stover, 176 So. 3d 854, 863 (Ala. Civ. App. 2015)). The trial court did as instructed, and the husband has appealed a second time, again challenging the division of marital property, among other things.

The evidence presented at trial indicated the following. The parties married in 1988 and had two children, both of whom were adults at the time the wife filed a complaint for a divorce. At the time of the trial, the wife was fifty-eight years old; the husband was sixty-three years old.

2

In <u>W.D.G.</u>, this court determined that sufficient evidence supported the trial court's decision to divorce the parties based on the husband's adultery. ___ So. 3d at ___. However, to analyze whether the division of marital property was equitable, we must discuss the husband's conduct in more detail.

The wife testified that, after thirty-four years of marriage, she left the marital residence in July 2022. She said that she thought that she and the husband had a great marriage until October 2017, at which time the husband became seriously ill. According to the wife, the husband developed profound breathing issues and was initially admitted to the local hospital in Waycross, Georgia, where the parties lived. He was placed on life support and transferred to the Mayo Clinic in Jacksonville, Florida. After a series of tests, the wife said, the husband was diagnosed with AIDS. Because the husband was not conscious when the diagnosis was made, she said, the husband's doctors informed her of the diagnosis. The husband remained hospitalized for about two months. The wife said that, when he was released from the hospital and returned home, she asked him whether there had been "anybody in your life that this

3

happened with." She said that he told her that he had been raped by two men.

At the trial, the husband disputed that he had AIDS, but he acknowledged that he had HIV. He testified that he had not "voluntarily" had a sexual relationship with anyone outside of his marriage to the wife. However, he said, in 2011 or 2012, he was driving through Arkansas for work when equipment he was transporting in the bed of his truck began sliding from the truck. He said that he pulled to the side of the road and was trying to pull the equipment back in when a man pulled his vehicle in behind him, showed him a badge, and said that he would help him. The husband testified that he believed that the man was a policeman. Then, he said, another truck pulled to the side of the road, and the driver of that vehicle and the other man seemed to know each other. The husband said that the next thing he remembered was waking up in a ditch and that it looked and felt like "things had been done to me." The husband testified that he did not tell the wife or file a police report because he was embarrassed and did not want anyone to know what had happened.

On cross-examination, the husband acknowledged that, in his discovery responses, he had indicated that perhaps he had contracted AIDS from a blood transfusion. He said that one of the physicians who had treated him when he was critically ill had sent him a letter notifying him that he had "started getting blood transfusions the minute I entered ICU." The wife's attorney then asked: "And so you believe that you got AIDS at the same time you were diagnosed with AIDS?" The husband replied: "I had started getting transfusions on around the 30th of October. The HIV test was not given until May the 4th and I wasn't diagnosed until May the 5th -- I mean October 5th." He then testified that it was "more likely" that he contracted AIDS from a blood transfusion.

The trial court and the husband then had the following exchange:

"THE COURT: Time out. You sat up here and spent the whole day talking about when you were raped and that's where it came from. You didn't say not one word when asked multiple times about this anything about a blood transfusion. It's only now that we discover that [the wife's attorney] brings up you said that in a discovery response, and now you want me to believe that it's from a blood transfusion and not from being raped in Arkansas?

"THE [HUSBAND]: I'm trying to answer as shortly as I can.

"THE COURT: No, your answers seem to be in flux, and they just kind of roll with whatever the question is."

When the husband was released from the hospital, he came home to Waycross and continued to work, and the wife and he stayed together, although they were no longer intimate. The wife testified that the husband "stayed on the computer and stayed on the phone a lot at night," adding that he would "get up like at two or three o'clock in the morning and get on his computer." She said that if the husband was on the computer or on the telephone when she walked into the room, he would turn off the computer or the telephone. She said that she would ask to see what he was doing but that he would never let her see either device. On cross-examination, the wife testified that she did not know what was on either one.

The wife said that she made the decision to leave the marital residence in July 2022 when she saw the husband sitting in his home office texting on his telephone. She asked to see the telephone, but, she said, he would not let her. She said that she told the husband that she loved him, but that she could not "live this life anymore," and left.

The wife testified that she was "a nervous wreck about having AIDS" and that, at first, she tested numerous times a year. At the time of the trial, she said, she still tested for AIDS at least once a year. All

results had been negative. The husband testified that, after he was raped,

he and the wife had continued to have unprotected sex until he became

ill. When he said that he would not put the wife in danger, the trial court

and the husband had the following discussion:

> "THE COURT: Then why after you got raped on the side of the road, you were certainly aware about sexually transmitted diseases, right? I mean, you are aware that that can happen; is that true? Do you know that?
>
> "THE [HUSBAND]: Yes.
>
> "THE COURT: And are you aware that homosexual sex is more likely than not to have STDs associated with it?
>
> "THE [HUSBAND]: I don't know that I was aware of it then.
>
> "THE COURT: My point is, is why didn't you tell your wife so that y'all could go get tested to make sure, because did you not have an obligation to her since she's your sexual partner and you knew you had been violated sexually?
>
> "THE [HUSBAND]: Right after that I had back surgery.
>
> "THE COURT: No, that's not my question. I didn't ask you if you had back surgery, I asked were you not obligated to inform her?
>
> "THE [HUSBAND]: I thought I didn't think I had anything.
>
> "THE COURT: How would you know you didn't have anything? Did you go get checked?

"THE [HUSBAND]: Within a couple of months, yes, sir, I was checked.

"THE COURT: Okay, and you came back, and it showed nothing, and so you didn't tell your wife?

"THE [HUSBAND]: Yes, sir.

"THE COURT: Okay. Did you get retested down the road?

"THE [HUSBAND]: No, sir.

"THE COURT: Were you instructed that you need to be retested?

"THE [HUSBAND]: No, sir, because I didn't tell them I had been raped. I didn't tell anybody anything."

On cross-examination, the husband reiterated that, two months after he was raped, he was tested for sexually transmitted diseases because he was going to have back surgery and that he did not think to be tested more than once to protect the wife.

The parties' adult daughter ("the daughter") testified that, at a family gathering after the time the husband was diagnosed with AIDS but before 2019, she used the husband's cellular telephone to try to locate her missing telephone. When she opened the husband's telephone, she said, there was a picture of a penis and text messages in which the husband referenced a meeting with the person who had sent the picture.

The daughter took a screenshot of the picture and texts, sent them to herself, and later sent the screenshot to the husband "so that he would know" that she had seen it. When the husband and the daughter talked, she said, the husband told her that he had never seen the man and that if the daughter told the wife, it would ruin the marriage. The husband also told the daughter about being raped when on a trip to Arkansas. The husband explained to the daughter that he did not go to the hospital for treatment because he was embarrassed, and, she said, he told her that he was not gay. The daughter did not share knowledge of the picture and text messages with the wife until the wife left the marital residence, because, she said, she did not want to be the reason they divorced.

The daughter also related another incident that occurred after the husband's AIDS diagnosis, when she saw on the husband's open computer a picture of a man wearing a leather collar and no shirt. The daughter said that it appeared to be an "online sex chat room thing."

The daughter testified that the husband had strokes in 2019 and that, afterward, the wife told her that the husband wanted her to have sexual relations with him. The daughter said that the wife did not want to. The daughter also said that the husband told her that the wife would

not have sex with him and said that they could not have a marriage relationship without it.

The daughter testified that, in February 2023, she received a telephone call from "a foreign man" who asked about the husband and then said that "if [her] gay ass dad did not give him money that they were going to rape and murder [her]." She also received threatening texts that included the husband's cellular telephone number and his Facebook profile picture. She said that she called the police, but no arrests were made, and the caller was never identified.

The daughter said that she told the husband about the communications, and, she said, he told her that he had been contacted, as well. The husband sent the daughter screenshots of text messages that he had received. When the daughter asked the husband who was sending the messages, the husband told her that she "[did not] need to know everything" and that he would contact the FBI. The daughter testified that the FBI never contacted her about the threats. She also said that the husband claimed that his cellular telephone had been hacked through Facebook and that it had happened to several other people. The husband obtained a new telephone and telephone number at that time.

The daughter read into the record one of the screenshots that the husband had sent to her in which the person sending the text messages to the husband demanded $5,000 or threatened to kill the daughter. The husband told the other person to "just kill me," "I'm a broke man," to which the person replied: "Done, but I'll kill them first, that's my word." The daughter read from a second screenshot in which the husband indicated that he would take the text messages to the district attorney if the person sending the texts did "anything." The husband corroborated the daughter's testimony regarding the text messages that were sent to him. He said that he had never met the person sending the text messages and that he had "no idea who that is."

The wife testified that the husband suffered another health setback in May 2019, when he had a stroke. After the stroke, she said, the husband developed anger issues and would become easily frustrated with her and with the people with whom he worked. She said that his anger and frustration at work reached the point where he resigned in 2020 after a verbal dispute with his employer.

The primary issue on appeal involves the distribution of marital property, and the parties had substantial assets. The evidence related to

the parties' marital assets indicated that most of the husband's career was spent in management positions in the manufactured-housing industry. The wife testified that he had been a very good provider and a very good father to their children. The wife testified that the husband had a bachelor's degree in accounting and that his income was in the six figures during most of the marriage. Between 2016 and his retirement in 2020, she said, the husband worked for ScotBilt Homes ("ScotBilt"), in Waycross, Georgia, and that his income from ScotBilt was between $800,000 and $900,000 annually. The parties' 2020 joint federal-income-tax return indicated that he earned $817,000 that year. The joint income-tax return for 2021, the year after the husband retired, indicated that the husband's taxable income was $43,358.

The husband testified that, at the time of the trial, he was receiving Social Security disability benefits in the amount of $3,182 per month. At one time he had also been receiving disability benefits from a OneAmerica policy that he had through "the plant," apparently ScotBilt, in the amount of $1,818 per month. However, in September 2023, OneAmerica disputed its obligation to pay the husband disability benefits and asked the husband to have an independent medical

examination before it would continue paying the disability benefits. The husband said that he planned to comply with OneAmerica's request, but, at the time of the trial, he was receiving disability benefits only from Social Security.

The husband testified that he had had no other income in the six months preceding the trial, but, in the six months before that, he had "made some good money" from an investment that he had made in crude-oil futures. The record did not indicate a specific amount of income that the husband earned from that investment.

The wife testified that she did not finish high school and that, although the husband had told her that she could return to school and earn a degree if she wanted to, he did not encourage her to work, saying it was "just going to mess up [their] taxes." At the time of the trial, the wife said, she worked for a menswear clothing store earning $15 per hour. She said that she worked thirty-six hours each week, but that she could work more if she wished. She said that her weekly gross income was $540 and that her weekly net income was $425. When asked whether her net income was about $1,842 per month from the clothing store, the wife said that she "guessed" but that she really did not keep up with it. She said

that, if she moved out of her father's house, where she said that she had been living since she had left the marital residence, her expected monthly expenses would be $3,255, which did not include money for vacations, gifts, and the like. She said that, based on her current income, she was not able to move from her father's house and asked the trial court to fashion an alimony award for her of "whatever [the court] thinks is supposed to be right for me."

The wife testified that the husband had handled the parties' finances during the marriage. She said that, when the husband retired, they left Georgia and returned to their hometown of Hamilton, where the husband had recently purchased land. The marital residence at the time of the trial was a double-wide mobile home located on the land, which the husband said was ninety-seven acres. The parties agreed that the land had cost $175,000 and that the mobile home had cost $30,000. The husband testified that he spent about $125,000 to renovate the mobile home. The parties did not owe any money on the land or the mobile home. The husband estimated that the parties had approximately $330,000 invested in the land and the mobile home. The wife asked that the marital residence be sold and that she be awarded half the proceeds.

14

In addition to the marital residence, the husband and the wife also owned an interest in a house in Monroe, Georgia, where their son and his family lived. The wife testified that they had paid cash for the house for the son. The wife said that she wanted the son to have the house; the husband asked the trial court to consider the parties' ownership interest in the Monroe house as a marital asset. The parties had also purchased a house for their daughter, but there was no evidence indicating that their names appeared on the deed to that house.

The parties also operated a business in Hamilton called D&K Rentals. The wife said that, soon after they married, the parties had purchased an old automobile dealership that they turned into storage and office space that they rented. She said that the business had about ten storage bays, large offices, and a mobile unit "that's out on the land beside it that we rent also."

The wife said that the business provided the parties with marital income. The husband testified that, according to tax returns, the net income that D&K was producing at the time of the trial was between $400 and $500 per month. The wife said that, on January 5, 2023, after she had left the marital residence, the husband sold the D&K building to

15

a friend for $208,545, at 7.8% interest. The husband held the mortgage on the building. The wife said that renters have told her that the husband is still collecting rent. The wife told the trial court that she wanted half the original D&K business because, she said, she believed that she had worked for the business as much as, if not more than, the husband. She said that she had collected rent, kept the grounds, and cleaned the storage units or offices when people moved out.

Regarding the parties' monetary assets, the wife said that, in 2022, the husband received a settlement of $540,000 from ScotBilt.[1] The wife said that the husband deposited the settlement proceeds into their joint checking account at Wells Fargo Bank ("the Wells Fargo joint checking account"). Money from other sources, such as insurance payments, the husband's disability benefits, and payments to the husband for work he had done to repair homes, was also deposited into the Wells Fargo joint checking account.

---

[1]The husband testified that he had commenced an action against his former employer to recover compensation that he claimed he was owed, as well alleging that a hostile work environment had caused him to have strokes. The wife was not a party to that action.

The wife testified that, without telling her, immediately after depositing the settlement proceeds into the Wells Fargo joint checking account, the husband moved $100,000 to a TD Ameritrade investment account. The husband said that he did so in the hope of earning more money through investments. In June 2022, the husband paid $32,102, the amount owed on the wife's BMW sport-utility vehicle at that time, from the Wells Fargo joint checking account. The wife testified that she had been aware of that expense. The husband also wrote a check from the Wells Fargo joint checking account for $28,597 to pay off their daughter-in-law's BMW sport-utility vehicle. The wife said that, although she was not aware that the husband had made that payment, she did not have a problem with it. The wife also identified payments that the husband made from the Wells Fargo joint checking account to OneAmerica for $48,852 and to the Internal Revenue Service ("the IRS") for $133,000 as legitimate expenses, although, according to the parties' 2022 income-tax return, they were to receive a refund of $97,315 from the $133,000 paid to the IRS. The husband said that, at the time of the trial, he had not yet received that refund and that he had been told it was "under review."

17

The husband testified that he had used the settlement proceeds to pay bills, to remodel the marital residence where the parties were living at the time the wife left the marital residence in July 2022, to pay off the two BMW sport-utility vehicles, to pay off several credit cards, and to install a utility building at the parties' son's house and a generator at their daughter's house. The husband said that he did not move any of the settlement proceeds from the Wells Fargo joint checking account into a separate account that he had not disclosed or of which the wife was unaware and that he had not hidden cash from the wife or made any investments that he had not disclosed.

The husband said that he had to renovate the marital residence after there had been a fire in the kitchen. The husband testified that he received a total of between $40,000 and $50,000 from the insurance company to pay for those renovations and that he deposited the money into the Wells Fargo joint checking account.

In December 2022, the wife said, the Wells Fargo joint checking account had a balance of $80,000. The wife withdrew $43,000 of that amount and deposited it into a Wells Fargo banking account that she opened in 2022. She said that she had been using that money to pay her

living expenses. The husband testified that, at the time of the December 2023 trial, the Wells Fargo joint checking account contained about $500. The wife asked the trial court to award her half the balance of what remained in the Wells Fargo joint checking account. The husband said that there "might be $12, $13,000" in "the other Wells Fargo checking accounts" that he had. The husband testified that he had three Wells Fargo accounts that were in his name only.

The wife said that the parties had two accounts with TD Ameritrade; her name was on only one of those accounts. Regarding the TD Ameritrade accounts, the wife testified that, in September 2022, one account had a balance of $100,148, which included the settlement proceeds the husband had transferred from the Wells Fargo joint checking account. In November 2022, after the wife had left the marital residence, $84,701 was transferred from the TD Ameritrade account, leaving a balance of $31,782. The wife said that she did not make the transfer and that she did not know what became of the $84,701. After the wife filed for a divorce in March 2023, an additional $25,000 was transferred from the TD Ameritrade account in April and May 2023, and she was unaware of what became of that money, as well. The husband

19

said that if he removed money from the TD Ameritrade account, it was to pay attorneys' fees. The husband testified that he believed there was "$70-something" in that account at the time of the trial.

The husband also had a "rollover [individual retirement]" account with TD Ameritrade, which the wife said that she was not aware of until the husband became critically ill. The statement for that account indicated that, in December 2022, a distribution of $82,200 was taken from the account. A subsequent statement showed that, in May 2023, the account had a balance of $1,203. The husband said that that account contained $500 or $600 in it at the time of the trial. The wife asked the trial court to award her half the values of the TD Ameritrade accounts.

Additionally, each party had his or her own individual retirement account ("IRA") with Stone Wealth. The wife testified that, at the time of the trial, her IRA had a value of about $56,000. The husband had made all of the contributions to her IRA, she said. The husband also had an IRA with Stone Wealth; however, the wife said that, at the time of the trial, he had moved that money, and she did not know what he had done with it. In November 2020, the husband was issued an annuity IRA account with an initial deposit of $300,000 and a cash surrender value of

$267,834. The wife said that she believed that that account included the money that had been in the husband's Stone Wealth IRA account. She said that the last time she had seen a statement regarding that account, it had a value of "$440-something thousand." The wife again asked the trial court to make a fair division of the retirement accounts.

Regarding personal property, the wife testified that, when she left the marital residence, she took with her clothes, jewelry, and her BMW sport-utility vehicle and moved in with her father, with whom she still lived at the time of the trial. The wife testified that, at the husband's expense, an appraiser in Tuscaloosa appraised forty pieces of jewelry, which the wife said was all the jewelry she had, for $215,118. The husband testified that the wife had costume jewelry besides the forty pieces that had been identified and appraised.

The wife testified that each piece of the appraised jewelry had been a gift to her from the husband. She said that he never told her that the jewelry was intended to be an investment. The daughter corroborated the wife's testimony, saying that she often shopped with the husband to buy the jewelry as gifts for the wife. The husband testified that, when he purchased some of the jewelry, he had intended some pieces to increase

in value and to be passed down as family heirlooms but that he also had believed that some pieces could possibly be sold when the parties grew older and the wife stopped wearing it. Regardless, the husband said, he was not asking the trial court to award him any of the jewelry but to consider its value when dividing the marital assets.

The wife testified that, when the parties sold the larger house that they had lived in in Hamilton, they placed "everything in storage." The wife said that she had personal property in both the current marital residence and in the storage unit. She had made a list of the personal property she wanted and presented the trial court with a three-page list of that property. She added that she was unable to remember all the items that were boxed and in storage and that she wanted an opportunity to go through those boxes and perhaps add additional items to the list.

The husband disputed about five of the items on the list, including the bedroom set that he owned when the parties married, silver and antique lamps that he had when they married, and things that had been in his family that he had before he married. The husband told the trial court that those things had been used during the marriage. The husband also disputed a battery-powered blower that he said that he used to blow

22

off the front porch. Otherwise, he said, he was satisfied with the wife's receiving the other items on the list. The wife testified that she was willing for the husband to keep the guns and other gifts she had given to him during the marriage.

The wife testified regarding the value of the husband's recreational vehicles and farm equipment. He had a Polaris Ranger that appraised for $7,850, a John Deere tractor that appraised for $12,000, a John Deere zero-turn mower that appraised for $5,500, a John Deere tiller that appraised for $1,100, a skid steer that appraised for $9,500, two 500-gallon fuel tanks for which the wife said she paid $8,000, a single-axle trailer that appraised for $1,000, a twenty-foot tandem-axle trailer with a ramp that appraised for $1,000, a four-foot box blade that was "well used" that appraised for $300, and a sprayer that the husband purchased "after the divorce" for $200. The total value of the equipment was $39,450. The wife said that, to the best of her knowledge, all the equipment was at the marital residence at the time of the trial. She asked the trial court to equitably divide the equipment or to consider its value when dividing the marital assets.

After the wife commenced the divorce action, the husband used a credit card to make a single purchase of cologne for himself at Saks Fifth Avenue for $594, and he spent about $715 at one store to purchase several wrist watches, a silver ring, and "a jade of art that was Brazilian emerald carved" that he said he thought he could have cut and "make some money off of it." He said that he paid the credit-card bill in full each month and that he had enough money in his checking account to do that. He said that he also purchased University of Alabama football tickets for $3,000 per season.

The wife said that the parties had two life-insurance policies that she believed the husband had purchased soon after they married. Each was a named insured on each policy. The wife said that she did not know what the cash value of the policies were but that the husband had told her that, together, the policies were for almost $1 million. She asked the trial court to be named the beneficiary of one of the policies or to be awarded one of the policies and have the husband continue to pay the premiums. The husband testified that, at some point, the parties had borrowed the cash value on one of the policies and that that policy would cancel in December 2023 unless he repaid the loan. He also said that that

24

policy "all goes away when [he] turns sixty-seven years old" but that he was okay with the wife receiving the other policy, which would pay $300,000 if he died, if she paid the premium.

The wife testified that she and the husband had had health insurance through Blue Cross/Blue Shield. She said that the husband notified her by text message that, when his Medicare coverage became effective on March 1, 2023, he would no longer have Blue Cross coverage. However, the wife said, the husband gave her the name of someone to speak with at Blue Cross, and the husband assured her that she would be able to continue her coverage with an individual policy. A few months later, the wife said, she had her regularly scheduled HIV/AIDS testing done and then received a bill for $440. According to the wife, that was when she learned that her health-insurance coverage had been canceled. The wife acknowledged that she had not seen any documentation from Blue Cross indicating that the husband had canceled her health-insurance coverage. The wife had since obtained her own health-insurance policy.

The husband denied that he canceled the wife's health-insurance coverage. He explained that, when he received Medicare, he was told that

25

he could not obtain a Medicare supplement without first canceling his Blue Cross policy. The husband testified that he advised the wife in November 2022 that he would have to cancel the Blue Cross policy and that he provided her with the contact information of the Blue Cross agent who he thought was going to call her. He said that he told the wife that he would help her if needed but that she told him she would handle it.

The wife told the trial court that she wanted her BMW sport-utility vehicle and that she did not have a problem with the husband being awarded his truck, which the husband said was a 2015 Ford F-150 pickup truck that was paid for. When asked about the 2020 Lexus sport-utility vehicle that the husband purchased after the wife commenced the divorce action, the wife replied: "It's his Lexus." The husband testified that he paid $52,000 for the Lexus and that he owed between $35,000 and $36,000 on that vehicle. The wife also requested that the husband pay her attorney's fees, which at the time of the trial amounted to more than $16,000.

The parties' adult son ("the son") testified that, after the wife moved from the marital residence, he had had conversations with the husband about the husband's wanting to move money from accounts because, the

son said, the husband "didn't want [the wife] to steal everything he had worked for." The husband also told the son that he wanted to move or to sell D&K, the storage business, so that the wife "doesn't get anything." The husband testified that he believed that the son "was a little mixed up." He explained that he had sold the property to establish a "legitimate value" for the business. He said that he wanted to buy out the wife and that she had asked him for $750,000. The husband said that the business was not worth that much.

At the close of the evidence, the trial court urged the parties to settle and advised the husband that the breakdown of the marriage was entirely his fault. The trial court gave the parties a day and a half to reach a settlement, but they were unable to do so. On January 16, 2024, the trial court entered its final judgment divorcing the parties based on the husband's adultery, dividing the parties' property and debts, ordering the husband to pay the wife alimony in gross, and ordering the husband to pay a portion of the wife's attorney's fees. The husband appealed.

On November 15, 2024, this court issued an opinion concluding that sufficient evidence supported the trial court's decision to divorce the parties on the ground of the husband's adultery; however, we reversed

the judgment to the extent that the trial court had awarded the wife more than 50% of the value of the husband's retirement accounts and remanded the case for the trial court to "make an equitable division of the parties' property." W.D.G., ___ So. 3d at ___.

On November 20, 2024, the trial court purported to enter an amended final judgment divorcing the parties, dividing the martial property, and awarding the wife alimony in gross. However, because this court had not yet issued the certificate of judgment in W.D.G., the trial court was without jurisdiction to enter that judgment.

On December 23, 2024, the trial court properly entered its amended final judgment. In that judgment, the trial court divorced the parties on the ground of "homosexual adultery on the part of the Husband." The trial court found that the husband was "solely responsible for the breakdown of the marriage and attribute[d] no fault to the Wife." The trial court also explicitly found that the husband "was anything but credible" and, therefore, "discount[ed] his testimony" and specifically observed that the husband's testimony regarding the alleged rape was "totally unbelievable."

28

In the judgment, the trial court ordered the husband to pay the wife $200,000 as alimony in gross, but it did not award the wife periodic alimony. It also awarded the wife the marital residence, the ninety-seven acres of land, and all the equity in the marital residence and property. It also awarded the wife the husband's interest in the house in Monroe, Georgia, where the son lived with his family.

Regarding vehicles, the trial court awarded the wife the BMW sport-utility vehicle that she drove, as well as the Ford F-150 that the husband had driven, and the "sole use and possession" of the BMW sport-utility vehicle that the husband had purchased, which the parties' daughter-in-law was driving. The trial court also awarded the wife certain farm equipment, including the Polaris Ranger, the John Deere tractor, the John Deere zero-turn mower, the skid steer, the two 500-gallon fuel tanks, the single-axle trailer, the twenty-foot tandem-axle trailer with a ramp, the John Deere tiller, the four-foot box blade, and the sprayer. The trial court directed the husband to pay the debt remaining on the John Deere tractor and the John Deere zero-turn mower.

Additionally, the trial court awarded the wife all her jewelry, clothing, shoes, accessories, and personal property and fifty-five items of certain enumerated household goods and furnishings. She was also awarded eight items of personal property that was kept at the D&K building.

Other debt the trial court assessed to the husband included reimbursing the wife the $440 medical bill she incurred for her HIV/AIDS test after she was dropped from the parties' Blue Cross health-insurance coverage, as well as all other marital debts. Each party was ordered to be responsible for the debts incurred in his or her own name.

As to the parties' financial accounts, the trial court awarded the wife 50% of the husband's annuity IRA account that had a value of $286,271, 50% of the husband's TD Ameritrade rollover IRA, and 50% of the parties' joint TD Ameritrade account.

The trial court awarded the wife the D&K rental business, and it assigned her the husband's rights to the mortgagee of the building housing that business, entitling her to receive all mortgage payments owed because of the sale of that building, and the husband's rights as the lessee pursuant to the lease agreement with the building's purchaser.

Subject to the awards made in the judgment, the trial court awarded each party all items of personal property currently in his or her sole name, including cash, bank accounts, retirement plans, jewelry, securities, and the like.

Finally, the husband was directed to reimburse the wife $16,000 toward her attorney's fees. He was also directed to maintain the current life-insurance policies naming the wife as the beneficiary until he has fulfilled the terms of the judgment, at which time he can choose the beneficiary of the policies.

The husband again appealed.

<u>Standard of Review</u>

When this court reviews a divorce judgment entered after the presentation of ore tenus evidence, we presume that the trial court's factual findings are correct, and we will reverse a judgment based on those findings only if the evidence does not support the judgment so as to render it plainly and palpably wrong. <u>Clements v. Clements</u>, 990 So. 2d 383, 389 (Ala. Civ. App. 2007). The presumption of correctness of factual findings under the ore tenus rule "is based on the trial court's unique position to observe the witnesses and to assess their demeanor and

credibility." <u>Glazner v. Glazner</u>, 807 So. 2d 555, 559 (Ala. Civ. App. 2001). Furthermore, "the <u>ore tenus</u> standard of review has no application to a trial court's conclusions of law or its application of law to the facts; a trial court's ruling on a question of law carries no presumption of correctness on appeal." <u>Ex parte J.E.</u>, 1 So. 3d 1002, 1008 (Ala. 2008) (citing <u>Ex parte Perkins</u>, 646 So. 2d 46, 47 (Ala. 1994)).

Analysis

The husband contends that the trial court's division of the marital property was inequitable because the wife received the vast majority of the marital assets.

The division of marital property is a matter within the sound discretion of the trial court. <u>DeJean v. DeJean</u>, 406 So. 3d 835, 840 (Ala. Civ. App. 2024). "A court has no fixed standard to follow in ... dividing marital property. Rather, the ... division need only be equitable and be supported by the particular facts of the case." <u>Ex parte Elliott</u>, 782 So. 2d 308, 311 (Ala. 2000).

> "In making an equitable division of property, a trial court should consider not only the length of the parties' marriage and the source of the parties' property, but also the parties' respective ages, health, station in life, contribution to the marriage, and future prospects. In addition, the trial court should consider the value and type of property owned, the

32

standard of living to which the parties have become accustomed during the marriage, and the parties' potential for maintaining that standard of living after the divorce."

Antepenko v. Antepenko, 549 So. 2d 1357, 1359 (Ala. Civ. App. 1989). Additionally, the trial court can consider the conduct of the parties and the reason for the breakdown of the marriage. See Clements v. Clements, 990 So. 2d 383, 392 (Ala. Civ. App. 2007).

"The weight or importance assigned to any one of these factors is primarily left to the trial court's discretion when apportioning property. This discretion will not be disturbed on appeal unless found to be plainly and palpably wrong." Antepenko, 549 So. 2d at 1359. Moreover, an appellate court cannot substitute its judgment for that of the trial court; instead, the appellate court is to determine whether sufficient evidence supports the trial court's decision "'against a charge of arbitrariness and abuse of discretion.'" Ex parte Elliott, 782 So. 2d at 311 (quoting Ex parte Smith, 673 So. 2d 420, 422 (Ala. 1995)). "'Where one spouse is guilty of misconduct toward the other spouse, the trial court's award may be as liberal as the estate of the offending spouse will permit under the circumstances.'" McDowell v. McDowell, 644 So. 2d 27, 28 (Ala. Civ. App.

1994) (quoting <u>Shirley v. Shirley</u>, 600 So. 2d 284, 287 (Ala. Civ. App. 1992)).

Without question, the division of marital property in this case heavily favors the wife. In <u>Murphy v. Murphy</u>, 624 So. 2d 620 (Ala. Civ. App. 1993), a case the husband attempts to distinguish, this court affirmed a portion of a judgment that awarded the wife in that case all the marital property despite the husband's contention that he had been the sole breadwinner during the marriage. The husband was convicted of raping one of the wife's teenaged daughters, who he had adopted, and he was serving a twenty-five-year sentence at the time of the entry of the divorce judgment. <u>Id.</u> at 621. We wrote that when the attendant presumptions applicable in cases involving the division of marital assets were applied to the "extraordinary facts" in <u>Murphy</u>, we could not say that the trial court had abused its discretion in dividing the marital property. <u>Id.</u> at 623.

Here, the husband argues that no such "extraordinary facts" as those found in <u>Murphy</u> existed in this case to support the trial court's division of marital property. We disagree. The trial court found that the husband's homosexual adultery was the sole cause of the breakdown of

34

the marriage. However, not only did the husband's conduct cause the breakdown, it endangered the wife's health, if not her life, without any apparent concern on the husband's part. The trial court disbelieved the husband's contention that he had been raped by two men on the side of the road in Arkansas. Based on the evidence submitted, including the photographs and the apparent chat-room forum the daughter saw on the husband's electronic devices and the text messages between the husband and an unknown person seeking payment from the husband, apparently to keep his secret, all of which occurred years after the alleged rape, the trial court reasonably could have believed that the husband had continued to engage in extramarital affairs with other men while at the same time engaging in unprotected sex with the wife.

Even if the husband had been raped, however, his conduct afterward, including foregoing treatment; having his blood tested in preparation for surgery but without ever independently being tested out of concern of contracting a sexually transmitted disease, including HIV and/or AIDS; having unprotected sex with the wife for years, until he was diagnosed with AIDS; and refusing to tell the wife of the alleged rape so that she could receive testing for sexually transmitted diseases and make

informed decisions regarding whether to continue to have unprotected sex with the husband, demonstrates a clear disregard for the wife.

Based on the evidence, the trial court reasonably could have found that the husband put his wish either to avoid embarrassment or to continue to engage in risky behavior above his obligation to protect his wife, seemingly without any concern or misgivings about putting her health at risk. Additional evidence indicated that the husband put those same wishes before the welfare of the daughter, whose life was threatened by a person who was apparently attempting to blackmail the husband and was in communication with him. The trial court reasonably could have believed that the husband knew the identity of that person but did not inform law-enforcement officials, exposing the daughter to danger.

Based on the evidence, the trial court reasonably could have believed that the husband's continued conduct and his refusal to recognize that his behavior was detrimental to his family endangered the wife and the daughter. Under these extraordinary circumstances, we cannot say that the division of marital property was inequitable. See, e.g., Murphy, 624 So. 2d at 623.

36

CL-2025-0072

The husband also contends that the trial court abused its discretion in awarding the wife $200,000 as alimony in gross without also awarding the husband a present estate from which to pay that amount.

> "Alimony in gross is considered 'compensation for the [recipient spouse's] inchoate marital rights [and] ... may also represent a division of the fruits of the marriage where liquidation of a couple's jointly owned assets is not practicable.' Ex parte Hager, 293 Ala. [47] at 54, 299 So. 2d [743] at 749 [(1974)]. An alimony-in-gross award 'must satisfy two requirements, (1) the time of payment and the amount must be certain, and (2) the right to alimony must be vested.' Cheek v. Cheek, 500 So. 2d 17, 18 (Ala. Civ. App. 1986). It must also be payable out of the present estate of the paying spouse as it exists at the time of the divorce. Ex parte Hager, 293 Ala. at 55, 299 So. 2d at 750. In other words, alimony in gross is a form of property settlement. Ex parte Hager, 293 Ala. at 54, 299 So. 2d at 749."

TenEyck v. TenEyck, 885 So. 2d 146, 151-52 (Ala. Civ. App. 2003).

The husband earned a good income throughout the marriage, and, during the last five years that he worked for ScotBilt, he earned a minimum of $800,000 a year -- at least $4 million during that five-year period. In 2022, the husband received an additional $540,000 from ScotBilt as a settlement of claims he had filed against it. The parties' 2022 joint income-tax return indicated that they were owed a refund of $97,315 of the $133,000 that had already been paid toward their taxes, but the husband said that he had not yet received that money because

37

the refund was "under review." The husband testified that, after retiring, he had made "good money" on an investment in crude-oil futures. He also continued to maintain the lifestyle that he had had during his working years, spending nearly $600 on a bottle of cologne and $3,000 on football tickets and purchasing jade and several wristwatches. He testified that he had sufficient money to pay off each month the credit-card debt incurred for those purchases.

Using the figures the husband provided in his appellate brief, if we do not consider the $200,000 award of alimony in gross, the property awarded to the wife had a value of $1,271,734, including the marital residence and its surrounding ninety-seven acres. The husband contends that the value of the property he was awarded in the judgment, taking into consideration the debt he was assessed but excluding the award of alimony in gross, totaled only $121,822. It is undisputed that the husband took care of the finances of the parties throughout the marriage. Based on the husband's earnings from income and investments during the six years before the trial, the trial court reasonably could have believed that much of the parties' income was unaccounted for. Moreover, in setting forth in his brief the value of the property he received in the

38

property division, the husband did not include any money that he had been awarded that was contained in any banking accounts or investments he held in his name. He testified that he had three such accounts with Wells Fargo that he said had a value of between $12,000 and $13,000.

The son testified that the husband had told him that he wanted to move money from existing accounts because, the son said, the husband "didn't want [the wife] to steal everything he had worked for" and that he wanted to move or sell D&K, the parties' storage business, for the same reason. Additionally, the trial court found that the husband's testimony was not credible. Based on the husband's past income, the money and the value of the marital property that was disclosed during the trial, the husband's continued spending habits after the wife filed for a divorce, the husband's lack of credibility, and the son's testimony regarding the husband's intention to hide assets, the trial court reasonably could have believed that the husband had substantial hidden assets from which he could pay the wife alimony in gross in the amount of $200,000. See, e.g., Samayamanthula v. Patchipulusu, 338 So. 3d 787, 801 (Ala. Civ. App.

2021). We cannot say that the judgment is plainly and palpably wrong as to this issue.

Finally, the husband contends that the trial court erred by failing to award him half the costs of the appeal in W.D.G. The wife did not address this issue in her appellate brief.

This court issued the certificate of judgment in W.D.G. on December 4, 2024, and ordered that "the costs of the appeal(s) are taxed one-half to the appellant(s) and one-half to the appellee(s) as provided by Rule 35, Ala. R. App. P." Rule 35(a) provides, in pertinent part, that if a judgment is affirmed or reversed in part, "costs shall be taxed only as ordered by the court." Rule 35(c) provides:

> "The costs of producing the necessary copies of the clerk's record and the reporter's transcript shall be taxable in the trial court. A party who desires those costs to be taxed shall state the costs in an itemized and verified bill of costs, which the party shall file with the clerk of the trial court, with proof of service, within 14 days (2 weeks) after the issuance of the certificate of judgment pursuant to Rule 41[, Ala. R. App. P.]."

The record indicates that, on December 18, 2024, the husband filed in the trial court a verified and itemized bill of costs that included $2,250 for the cost of the trial transcript and the $200 docket fee paid to this court, for a total cost bill of $2,450. However, according to the record, the

trial court did not take any action on the cost bill in the judgment from which the husband appeals or in a separate order.

This court has held that when we "reverse[] a trial court's judgment and award[] costs to the appellant, the trial court has no discretion in awarding costs. Ex parte Blue Cross & Blue Shield of Alabama, 473 So. 2d 1045 (Ala. 1985). The trial court must award the appellant those costs of appeal that the appellant properly incurred. Rule 35(a), A[la]. R. App. P." Smith v. Player, 630 So. 2d 400, 401 (Ala. 1993). It is well settled that both the docket fee and the costs of producing copies of the clerk's record and the trial transcript are recognized costs for which the husband is entitled to reimbursement. Id.

Here, in the judgment the trial court did not mention taxing the costs of the appeal in W.D.G. to either party, and it specifically denied all relief requested but not specifically addressed in the judgment. Because the trial court failed to tax the itemized and verified costs to the appropriate parties as this court directed, the judgment must be reversed and the cause remanded for the entry of a judgment consistent with this opinion.

<u>Conclusion</u>

To the extent that the judgment divided the marital property and awarded the wife $200,000 as alimony in gross, it is affirmed. However, we reverse the trial court's judgment insofar as it denies the husband's request to tax the costs of the appeal in <u>W.D.G.</u> and remand the case to the trial court for it to amend its judgment to divide the costs of the appeal in <u>W.D.G.</u> between the parties, as this court directed in the certificate of judgment issued on December 4, 2024.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.

Hanson and Bowden, JJ., concur.

Moore, P.J., and Edwards, J., concur in part and dissent in part, with opinions.

MOORE, Presiding Judge, concurring in part and dissenting in part.

I concur in that part of the opinion reversing the judgment entered by the Marion Circuit Court ("the trial court") for failing to properly divide the costs of the previous appeal, see W.D.G. v. K.S.G., [Ms. CL-2024-0223, Nov. 15, 2024] ___ So. 3d ___ (Ala. Civ. App. 2024); otherwise, I respectfully dissent.

Upon a divorce, "[t]he marital estate is subject to equitable division and distribution." Ala. Code 1975, § 30-2-51(b). "Equitable distribution" is a legal process for dispersing marital assets and liabilities between divorcing spouses according to their respective equitable interests in the property regardless of legal title. See 1 Brett R. Turner, Equitable Distribution of Property § 1:1 (4th ed. 2019). In an equitable-distribution system, "a trial court must first ascertain what property and debt belongs in the marital estate." McCarron v. McCarron, 168 So. 3d 68, 73 (Ala. Civ. App. 2014). "After determining the property within the marital estate, a trial court must ascertain the value of that property, equitably divide the property, and implement a fair method for distributing the property." Id. at 75. The purpose of equitable distribution "'is to give each spouse the value of [his or her] interest in the marriage. Each

43

spouse has a right, even a property right in this.'" <u>Lo Porto v. Lo Porto</u>, 717 So. 2d 418, 421 (Ala. Civ. App. 1998) (quoting <u>Pattillo v. Pattillo</u>, 414 So. 2d 915, 917 (Ala. 1982)). Through § 30-2-51(b), a divorcing spouse has a statutory right to receive an equitable share of the marital estate. <u>See</u> <u>Corriveau v. Corriveau</u>, 354 So. 3d 497, 501 (Ala. Civ. App. 2021) (quoting <u>Phillips v. Phillips</u>, 52 Ala. App. 234, 236, 291 So. 2d 322, 324 (Civ. 1974)) ("Even when marital property is titled jointly between the spouses, the trial court is required 'to make such division or settlement of the interests of the parties as equity requires.'").

In this case, W.D.G. ("the husband") maintains that, considering the liabilities imposed upon him by the final judgment, he received a negative share of the marital property. The husband notes that he was awarded half of his retirement accounts, or $143,822, his Tide Pride University of Alabama football tickets worth $3,000, his bank accounts with funds totaling $13,000, and his automobile, which he purchased for $52,000, but for which he owes $36,000. However, he was ordered to pay K.S.G. ("the wife") $200,000 in alimony in gross and to pay $38,000 in

44

marital debts. By this accounting, the husband's liabilities exceed the value of the marital property he received.[2]

However, at trial, the wife presented evidence indicating that the husband was hiding financial assets from the trial court, and she argued in her response to the husband's postjudgment motion that the trial court had properly considered those missing assets as part of the marital estate. See Kelley v. Kelley, 52 So. 3d 534, 540 (Ala. Civ. App. 2010) (noting the general rule that dissipated assets should be included in the marital estate); see also Turner, supra, at § 6:105 ("[W]hen marital assets are dissipated in anticipation of divorce, the dissipated assets are treated as if they were existing marital property."). After a hearing, the trial court denied the husband's postjudgment motion. From this context, the trial court must have implicitly determined that the husband had concealed $200,000 in marital funds in anticipation of the divorce and ordered the husband to pay the wife alimony in gross in the amount of $200,000 to account for those missing funds. See TenEyck v. TenEyck,

---

[2]For the purposes of this writing, I do not include the $97,315 income-tax refund claimed by the husband, which was a contingent asset that could not be used to compute the parties' net worth and should have been treated separately. See Yohey v. Yohey, 890 So. 2d 160, 166 (Ala. Civ. App. 2004).

885 So. 2d 146, 152 (Ala. Civ. App. 2003) ("[A]limony in gross is a form of property settlement.").

Under the ore tenus rule, the trial court's judgment and all implicit findings necessary to support it carry a presumption of correctness, and the judgment will not be reversed unless it is found to be plainly and palpably wrong. <u>Transamerica Com. Fin. Corp. v. AmSouth Bank, N.A.</u>, 608 So. 2d 375, 378 (Ala. 1992). In his brief to this court, the husband does not argue that the trial court's implicit finding that he concealed $200,000 in marital assets is plainly and palpably wrong.[3] The husband

---

[3]The wife presented evidence indicating that, in June 2022, the husband had deposited $540,000, the proceeds he received from a lawsuit that he had commenced against his last employer, into the parties' joint checking account. The wife agreed that the husband had properly used some of the proceeds from the settlement to retire certain marital debts totaling approximately $263,000, but she claimed that the husband could not account for the remaining funds. The husband testified that he had used the allegedly missing funds for legitimate purposes, such as improving the marital residence and the residences of the parties' children, which would account for some of the funds. However, the husband did not account for all the missing funds, <u>see</u> 1 Brett R. Turner, <u>Equitable Distribution of Property</u> § 6:105 (4th ed. 2019) ("A number of states have adopted the majority rule indirectly by holding that dissipation results when the spouse who last controlled missing assets is unable to prove how they were used or spent."), and the trial-court judge, who found the husband lacked credibility, could have reasonably determined that the husband had concealed approximately $200,000 in cash.

knew that his concealment of assets was an issue in the case, but he does not properly address that issue in his appellate brief. The husband has thus waived any argument that the trial court erred in considering the $200,000 in hidden assets to be part of the marital estate. See Ex parte Borden, 60 So. 3d 940, 944 (Ala. 2007).

Nevertheless, the central point of the husband's appeal remains intact. Even considering that the marital estate included $200,000 in funds concealed by the husband, the trial court awarded the husband an inequitable share of the marital estate. As the main opinion concludes, the wife received approximately 90% of the marital estate, including all the real property owned by the parties and their lone business asset. In addition to being left homeless, the husband was saddled with all the marital debt. The property division leaves the husband in a seriously disparate financial condition when compared to the wife. A disproportionate property division is not necessarily inequitable, Dobbs v. Dobbs, 534 So. 2d 621, 623 (Ala. Civ. App. 1988), but this court should closely scrutinize a property division that financially cripples a spouse. See, e.g., Walding v. Walding, 23 So. 3d 684, 688 (Ala. Civ. App. 2009).

When dividing marital property, the trial court must consider the economic contributions of each party to the accumulation of the marital assets. Weeks v. Weeks, 27 So. 3d 526, 533 (Ala. Civ. App. 2008). The evidence in the record shows that the husband was the breadwinner of the family, while the wife acted primarily as a homemaker. Before the parties married, the husband worked in the mobile-home business, and, after they married, he became the general manager of the business, earning over six figures. In 2010, when his employer sold its business, the husband found similar-paying jobs in other industries in Jasper and Tuscaloosa. In 2013, the husband became the general manager of ScotBilt Homes, a mobile-home manufacturer, where he worked until he retired in September 2020. At the height of his career, the husband earned over $800,000 annually. The wife worked sporadically during the marriage, but, by her own admission, her wages were insignificant.

The evidence in the record shows that, in 1993, the parties purchased an office building for $93,000 and formed D & K Rentals to manage the building. Throughout the marriage, the husband bought the wife jewelry, some of which was appraised for $215,118 in 2023. The husband also bought the wife a mink coat worth $5,000 and Louis Vuitton

luggage worth $10,000. In 2020, the parties purchased a house in Monroe, Georgia, for $197,500; the parties share title to that house with their son as joint tenants with the right of survivorship. In 2021, the parties purchased the marital residence, which consists of a 97-acre parcel of farmland that was purchased for $175,000 and a mobile home that was installed on the property for $30,000. In 2021 and 2022, the parties spent $125,000 improving the marital residence. The parties also purchased various pieces of farm equipment for $39,450. In 2022, husband used approximately $60,000 of the proceeds from his lawsuit settlement, see note 3, supra, to pay off the wife's BMW sport-utility vehicle and a second BMW sport-utility vehicle used by the parties' daughter-in-law. At that time, the husband was driving a 2016 Ford F-150 truck, but he later purchased a 2020 Lexus sport-utility vehicle for $52,000. The husband also used $100,000 of his settlement proceeds to fund a joint investment account for the parties. The wife maintained an individual retirement account valued at $56,677, and the husband had two retirement accounts valued at a total of $287,644. The husband contributed approximately $1,446,549 to acquire those assets, yet, except

for the Lexus automobile, the trial court awarded 100% of those assets to the wife.[4]

The trial court stated in the final judgment that, in making its property division, it had considered factors other than the source of the marital property, including the length of the marriage; the age and health of the parties; the future prospects of the parties; and the standard of living to which the parties had become accustomed during the marriage.  Those factors relate to the future financial needs of the parties.  See Turner, supra, at § 8:15.  Effectively, a trial court may award an increased portion of the marital estate to a financially dependent spouse, see, e.g., Wheeler v. Wheeler, 831 So. 2d 629, 634 (Ala. Civ. App. 2002); Phillips v. Phillips, 489 So. 2d 592, 593 (Ala. Civ. App. 1986), and economic dependency may be proven by showing that, due to age, health, education, work history, and other vocational factors, the spouse is unable to earn income sufficient to maintain the marital standard of living.  See Turner, supra, at § 8:15.

---

[4]The trial court later awarded the wife only 50% of the husband's retirement benefits, but only because this court reversed the judgment in W.D.G. v. K.S.G., supra.

As a result of the husband's earnings, the parties enjoyed a good standard of living during the marriage. The husband retired in 2020, however, and he was subsequently declared disabled by the Social Security Administration following two strokes. After his retirement, the husband received monthly disability benefits totaling $5,000 as his only steady income. As the wife acknowledged, at that point the parties could not be expected to live as they had before. See McCarron v. McCarron, 168 So. 3d 68, 77 (Ala. Civ. App. 2014) (quoting J.D.A. v. A.B.A., 142 So. 3d 603, 620 (Ala. Civ. App. 2013) (Moore, J., concurring in part, concurring in the result in part, and dissenting in part)) ("'In assessing the marital standard of living, a trial court should consider the period leading up to the divorce if that period accurately reflects the manner in which the parties would have been expected to live had they continued to be married.'"). The wife submitted an exhibit to the trial court indicating that she would need $3,255 per month to live as she had expected the parties would have been living following the husband's retirement.

Since May 2022, the wife, who was 58 years old at the time of the trial, had been working part-time at a retail-clothing shop, earning $1,842 per month. From her educational level and limited employment

history, the trial court could have concluded that the wife was not capable of earning sufficient income to meet her expected standard of living. However, the trial court did not receive any evidence indicating that the wife was economically impaired by any health problems. In the judgment, the trial court found that the wife had consistently tested for acquired immunodeficiency syndrome ("AIDS"), that she would continue to need testing, and that she lived in fear of having contracted AIDS. The evidence showed that the wife had ceased sexual relations with the husband in 2017 and that she had consistently tested negative since that time. The wife had not been diagnosed with either human immunodeficiency virus ("HIV") or AIDS in the seven years since she last had sex with the husband, and the wife did not testify to having any symptoms of HIV or AIDS. The wife was distressed by the thought that she could contract AIDS, but she did not present any expert testimony or scientific evidence indicating that, after years of negative test results, she remained at risk of developing the disease, and she did not present any evidence indicating that her economic prospects were diminished due to her emotional distress. See R.E.G. v. L.M.G., 571 N.E.2d 298 (Ind. Ct. App. 1991) (reversing judgment awarding a wife a disproportionate share

of the marital estate because, among other things, her fear that she would contract AIDS from her husband following his homosexual adultery was based on speculation and conjecture and the wife did not prove her emotional distress impaired her economic prospects). The wife also did not testify to any other health problems that would interfere with her earning capacity.

The wife testified that she could not meet her expenses based on her earnings, and she requested an award of periodic alimony to help her cover the approximately $1,400 monthly shortfall. See Shewbart v. Shewbart, 64 So. 3d 1080, 1087-88 (Ala. Civ. App. 2010). The trial court did not award the wife periodic alimony; instead, the trial court awarded the wife a greater share of the marital estate. However, the property award to the wife far exceeded the goal of meeting her economic needs. The trial court awarded the wife practically all the marital assets when a much more proportionate division still would have allowed her to meet her economic needs. Moreover, the property division did not account for the husband's economic needs. The husband, who was 63 years old, was disabled, was living on a fixed income, and was awarded only limited

resources in the judgment, cannot be expected to maintain nearly the standard of living as the wife under the terms of the judgment.

Ultimately, the trial court justified its disproportionate property division on the husband's adulterous misconduct during the marriage. The evidence, outlined at length in the main opinion, fully supports that the husband committed adultery and that his behavior placed the wife at risk of contracting AIDS and jeopardized the welfare of the parties' daughter. The evidence further shows, without dispute, that the husband bears full responsibility for the breakdown of the marriage. I do not agree, however, that the trial court properly weighed the fault of the husband in making the property division.

For most of the history of Alabama, statutory law provided that, "[i]f the divorce is in favor of the wife for the misconduct of the husband, the allowance must be as liberal as the estate of the husband will permit, regard being had to the condition of his family and to all the circumstances of the case." Ala. Code 1923, § 7419; Ala. Code 1852, § 1972. Based on that language, the appellate courts held that an innocent wife could receive as much as one-half of the estate of the guilty husband so long as the award did not financially cripple the husband. See Ortman

54

v. Ortman, 203 Ala. 167, 170, 82 So. 417, 420 (1919); Sides v. Sides, 284

Ala. 39, 43, 221 So. 2d 677, 679 (1969); Hendrix v. Hendrix, 56 Ala. App.

178, 180, 320 So. 2d 684, 686 (Civ. 1975).

In 1979, the legislature amended the operative statute to provide:

"If the divorce is in favor of either spouse for the misconduct of the other spouse, the judge trying the case shall have the right to make an allowance to either spouse out of the estate of either spouse, or not make an allowance as the circumstances of the case may justify, and if an allowance is made, the misconduct of either spouse may be considered in determining the amount; provided, however, that any property acquired prior to the marriage of the parties or by inheritance or gift may not be considered in determining the amount."

Ala. Acts 1979, Act No. 79-486, § 1, codified at Ala. Code 1975, § 30-2-52.

Section 30-2-52 now applies when a divorce is grounded upon the

misconduct of a spouse. Ex parte Drummond, 785 So. 2d 358, 362 (Ala.

2000); Gray v. Gray, 45 Ala. App. 564, 565, 233 So. 2d 504, 506 (Civ.

1970). Notably, the 1979 amendment deleted the language requiring a

trial court to make a "liberal" allowance to the innocent spouse when

divorcing parties on the ground of marital misconduct. The new standard

gives a trial court discretion only to consider the misconduct of an

offending spouse when determining the amount of the allowance.

Nevertheless, since the 1979 amendment, the appellate courts have held

that a trial court may exercise its discretion to award an innocent spouse an award as liberal as the estate of the offending spouse will permit. See Shirley v. Shirley, 600 So. 2d 284 (Ala. Civ. App. 1992); Wells v. Wells, 366 So. 2d 728 (Ala. Civ. App. 1979); Brasfield v. Brasfield, 679 So. 2d 1091, 1094 (Ala. Civ. App. 1996); and McDowell v. McDowell, 644 So. 2d 27, 28 (Ala. Civ. App. 1994).

But, even under this standard, a trial court must still consider the oppressive effect of the award on the offending spouse. When the misconduct of a spouse leads to the breakdown of the marriage, "a trial court should not impose monetary obligations on the [offending] spouse that will 'financially cripple' him or her." McCarron v. McCarron, 168 So. 3d at 81. The purpose of an equitable division is not to punish the spouse who caused the divorce, see Osborne v. Osborne, 216 So. 3d 1237, 1245 (Ala. Civ. App. 2016), or to compensate an innocent spouse for personal injuries inflicted upon him or her during the marriage, Coleman v. Coleman, 566 So. 2d 482, 485 (Ala. 1990) (recognizing that spouse may have a cause of action for the tort of negligent transmission of sexual

disease).[5] A spouse may achieve those goals through a civil action against the other spouse for personal injuries. See Murray v. Murray, 598 So. 2d 921, 922 (Ala. Civ. App. 1992); Howle v. Howle, 699 So. 2d 177, 179 (Ala. Civ. App. 1997). See also 2 Judith S. Crittenden & Charles P. Kindregan, Alabama Family Law § 40:22 (2d ed. 2015); James C. Maroulis, Can HIV-Negative Plaintiffs Recover Emotional Distress Damages for Their Fear of AIDS?, 62 Fordham L. Rev. 225 (1993).

Fault certainly is a factor to be considered in determining the proper division of the marital estate, see Ex parte Evans, 875 So. 2d 297 (Ala. 2003), but the trial court may not assign fault disproportionate weight when dividing a marital estate. In Antepenko v. Antepenko, 549 So. 2d 1357, 1359 (Ala. Civ. App. 1989), this court, without citation to any legal authority, stated: "The weight or importance assigned to any one of these factors is primarily left to the trial court's discretion when

---

[5]The trial court questioned the husband to ascertain whether, before 2017, he knew or should have known that he had contracted a sexually transmitted disease and whether he should have warned the wife before exposing her to the disease through unprotected sex. That inquiry would be particularly relevant in a tort action alleging negligent transmission of a sexual disease. See Berner v. Caldwell, 543 So. 2d 686 (Ala. 1989), overruled on other grounds by Ex parte General Motors Corp., 769 So. 2d 903 (Ala. 1999).

apportioning property." However, that quote does not imply that a trial court can determine that fault should override the other property-division factors. The fact that the trial court divorced the parties because of the husband's adultery did not automatically entitle the wife to a liberal allowance from the marital estate. See Hinson v. Hinson, 581 So. 2d 1123, 1123 (Ala. Civ. App. 1991). "The conduct of the parties is but one factor to be considered by the trial court." Anders v. Anders, 367 So. 2d 481, 483 (Ala. Civ. App. 1979). See also Bumpers v. Bumpers, 380 So. 2d 918, 919 (Ala. Civ. App. 1980); and Hallmark v. Hallmark, 394 So. 2d 44 (Ala. Civ. App. 1981).

In Grant v. Grant, 49 Ala. App. 559, 274 So. 2d 329 (Civ. 1973), the wife shot the husband in the head. The Coffee Circuit Court divorced the Grants on the ground of the wife's cruelty. The court awarded the husband all the marital property and awarded the wife only $5,000 as alimony in gross. This court reversed the judgment. This court noted that the Grants had been married for 30 years and that they had accumulated substantial real and personal property through their joint effort. The wife had earned wages to sustain the marriage while the husband had started a business, and the wife was the only spouse

58

earning taxable income toward the end of the marriage. This court recognized that the wife had shot the husband, but the court determined that she had not thereby forfeited her right to an equitable share of the marital estate. This court held that, after serving 30 years as a wife and at least an equal partner in building the marital estate, the wife should not be limited to $5,000 in alimony in gross.[6]

Grant illustrates that, when a spouse contributes financially to the accumulation of real and personal property over the course of a long marriage, the fault of that spouse in causing the breakdown of the marriage, even if particularly egregious, should not overwhelm the decision as to how the marital estate should be equitably divided. A trial court abuses its discretion when it overemphasizes fault and unduly reduces the offending spouse's share of the marital estate. See Shirley v. Shirley, 350 So. 2d 1041, 1044 (Ala. Civ. App. 1977) (noting that trial court had relied heavily on conduct of the offending spouse without giving equal consideration to other factors and reversing judgment to increase award to offending spouse); see also Turner, supra, at § 8:26 ("Appellate

---

[6]This court also determined in Grant that the judgment had indirectly required the wife to pay the husband alimony, which, at the time, was not allowed under Alabama law.

59

courts have not hesitated to reverse trial court decisions where fault was emphasized to the exclusion of other factors."). Despite the fault of a spouse leading to the divorce, a trial court should still give weight to the other property-division factors when ascertaining an equitable property division. See Nickerson v. Nickerson, 467 So. 2d 260, 262 (Ala. Civ. App. 1985) (holding that, although the wife admitted that she had committed adultery, trial court did not abuse its discretion in dividing marital property, which was largely accumulated by efforts of the wife during the over 10-year marriage). See also Martin v. Martin, 85 So. 3d 414, 421 (Ala. Civ. App. 2011); Morgan v. Morgan, 183 So. 3d 945, 958 (Ala. Civ. App. 2014), writ quashed, 183 So. 3d 969 (Ala. 2015), and disapproved of on other grounds by Ex parte Grimmett, 358 So. 3d 391 (Ala. 2022).

A trial court exercises its discretion properly when, despite the finding of fault, it does not arbitrarily favor one spouse over the other in dividing the marital estate. In Yohey v. Yohey, supra, the Yoheys were married for 20 years. The husband was the primary earner for the family, and, at one point, he owned two Precision Tune franchises. Although the wife had sometimes helped him with his business, the evidence showed that she was totally financially dependent upon the

husband. The wife believed that she was in a good marriage until the last year of the marriage, when she discovered that the husband was engaging in "cybersex" with numerous women and that he had committed adultery. The Madison Circuit Court divorced the parties on the ground of the husband's adultery, which it considered as a "particularly significant factor" in dividing the marital property.

> "The trial court ordered that the marital residence, which was valued at $180,000 and was subject to a mortgage of $112,100, be sold; the court directed that the wife receive 75 percent of the net proceeds from the sale. It awarded the wife the parties' Orange Beach condominium, which the parties agreed had a fair market value of $343,000, including all furniture, furnishings, and contents, and made the wife responsible for the existing first mortgage indebtedness of $151,600. It also awarded the wife $222,500 from the husband's IRAs; her IRA in the amount of $16,500; the bank accounts in her name; one-half of any tax refunds due to the parties upon the filing of joint tax returns; and one-half of any sums received from the sale of the Precision Tune franchise…. The court awarded the wife an equitable share of the contents of the marital home; a 1993 Plymouth Acclaim automobile; and her personal property, clothing, and jewelry…. The court ordered the wife to be responsible for any debts, including $6,000 of credit-card indebtedness, that she had incurred in her name alone.

> "The court awarded the husband 25 percent of the net proceeds from the sale of the marital residence; an equitable portion of the contents of the marital home; the bank accounts in the husband's name; three vehicles -- a 1981 Cadillac, a 1973 truck, and a Honda Accord ...; the remainder of the marital portion of the husband's IRAs not awarded to the wife,

61

totaling $245,671; one-half of any tax refunds due the parties; one-half of any sums received from the sale of the Precision Tune franchise ...; and the Lake Charlevoix property in Michigan, valued at $300,000. The husband was also ordered to maintain his existing life insurance policies with the wife as the beneficiary.

"The trial court made the husband responsible for the following debts and liabilities: the mortgage indebtedness on the marital home pending its sale; any judgment arising out of the lawsuit concerning the leased premises for the first Precision Tune franchise; any tax liability of the parties, including delinquent taxes and penalties arising out of the husband's failure to file income-tax returns for three years; indebtedness to the husband's parents in the amount of $13,500; and credit-card indebtedness in the amount of $12,000."

890 So. 2d at 163-64.

On appeal, this court affirmed the judgment. In addressing the property division, this court said: "Notwithstanding the trial court's specific finding of fault on the part of the husband and its granting the divorce on the ground of adultery, it is nevertheless apparent that the trial court did not arbitrarily favor the wife in dividing the parties' assets." 890 So. 2d at 165. This court noted that the husband had received substantial real property as part of his separate estate that could have been considered marital property and an equal share of the

largest marital asset, his retirement benefits, and approximately 35% of the marital property, while the marital debts were equitably distributed.

The main opinion in this case relies heavily on Murphy v. Murphy, 624 So. 2d 620 (Ala. Civ. App. 1993), to uphold the property division on the ground that this case involves "extraordinary facts" justifying the grossly disproportionate property division. In Murphy, the husband had been convicted of raping his adopted teenage daughter, and he was incarcerated pursuant to a 25-year prison sentence when the Lee Circuit Court divorced the parties. The wife was awarded all the marital assets. The husband appealed, arguing that the property division was inequitable because the marital assets had been acquired mainly through his financial contributions to the marriage. This court, after reciting general principles of law concerning equitable distribution, upheld the property division, stating only: "Applying the attendant presumptions to the extraordinary facts of this case, we cannot say that the trial court abused its discretion in the division of the marital property." 624 So. 2d at 623.

The "discussion" of the property division from Murphy is devoid of any legal analysis. It seems that in reaching its decision this court

considered primarily that the husband was incarcerated for a sex crime and was serving a 25-year sentence, but it did not explain how the law as applied to those facts warranted the conclusion that the property division was equitable. Only one year earlier, this court had affirmed a judgment awarding an incarcerated spouse only a few small items of personal property, also with little to no explanation. See Head v. Head, 612 So. 2d 1224 (Ala. Civ. App. 1992). The Murphy court may have reasoned that, in addition to being at fault for the breakdown of the marriage, the husband in that case had no need for the marital property to sustain his expected standard of living. "The court may consider as a division factor the fact that an incarcerated spouse's support needs will be met [and] paid by the government." Turner, supra, at § 8:19 (citing Matter of Marriage Perales, 58 Kan. App. 2d 26, 463 P.3d 427 (2020), and King v. King, 946 So. 2d 395, 404 (Miss. Ct. App. 2006)).

Regardless, I do not agree that an inequitable property division may be affirmed based on "extraordinary facts," a concept so vague as to be virtually meaningless. As Murphy itself recognizes, 624 So. 2d at 623, every property division is based on its own unique facts and circumstances. No other case has cited the portion of Murphy devoted to

64

property division or concluded that "extraordinary facts" may justify an extraordinarily disproportionate property division that would otherwise be inequitable. Accordingly, I do not consider that part of the opinion as stating any authoritative principle of law that would have any precedential value. See 21 C.J.S. Courts § 186 (2016) ("[A] single decision that has not been cited for many years is not necessarily followed as precedent.").

Moreover, even if Murphy could be considered as precedential, it does not apply in this case. From the evidence in the record, the trial court properly found that the husband committed adultery that led to the breakdown of the marriage. Furthermore, the evidence supports the trial court's finding that the wife lives in fear of contracting AIDS.[7] Unfortunately, spouses commit adultery so often that it is one of the leading grounds for divorce, see Ala. Code 1975, § 30-2-1(a)(2), and, in some cases, the innocent spouse has experienced emotional distress from the fear of contracting a sexually transmitted disease from the cheating spouse. See Turner v. Turner, 804 So. 2d 1118 (Ala. Civ. App. 2001);

---

[7]Although not cited as a factor by the trial court, the evidence also supports the conclusion that the husband had exposed the parties' daughter to vicious threats and harassment.

Anonymous v. Anonymous, 617 So. 2d 694 (Ala. Civ. App. 1993); Coleman v. Coleman, supra. See also Delay v. Delay, 707 So. 2d 400, 401 (Fla. Dist. Ct. App. 1998); Neal v. Neal, 125 Idaho 617, 873 P.2d 871 (1994); R.E.G. v. L.M.G., supra; Elkins v. Elkins, 238 So. 3d 1204 (Miss. Ct. App. 2018); and In re Marriage of J.T., 77 Wash. App. 361, 891 P.2d 729 (1995). The husband was not charged with any crime,[8] much less incarcerated. Even under the Murphy "analysis," this case, unlike a case in which a husband has raped his adopted daughter and is serving a 25-year prison sentence for the crime, would not be so extraordinary as to compel affirmance of a grossly disproportionate property division.

Having carefully and thoroughly reviewed the record, I am convinced that the trial court abused its discretion by using the property division to punish the husband for his callous disregard for the wife during the marriage. At the close of the testimony, the trial-court judge addressed the parties. The trial-court judge informed the husband that he considered the divorce to be entirely his fault and signaled that he was

---

[8]Section 22-11A-21(c), Ala. Code 1975, provides: "Any person afflicted with a sexually transmitted disease who shall knowingly transmit, or assume the risk of transmitting, or do any act which will probably or likely transmit such disease to another person shall be guilty of a Class C misdemeanor."

"inclined" to enter a harsh judgment against the husband. The trial-court judge encouraged the parties to settle the case to avoid further protracted proceedings. The trial-court judge said:

"I'm not trying to telegraph what I'm going to do or not going to do, because I'm not telling y'all exactly what I'm going to do in the order.

"But he's going to appeal, and you [the wife] are going to pay [your attorney] more money, and we'll still be in this thing and y'all will continue to be fighting, and there's a possibility after I enter my order, a good possibility, it may come back, and we may get to the try the case again, or we come back and have more hearings on this while y'all are left in limbo."

This court has already reversed a previous judgment for awarding the wife an exorbitant share of the husband's retirement benefits. This court should now complete its task by reversing the judgment because the trial court abused its discretion by failing to award the husband an equitable share of the marital estate, see Ex parte Smith, 673 So. 2d 420, 422 (Ala. 1995) (holding that the role of an appellate court is "simply to determine if there was sufficient evidence before the circuit court to support its decision against a charge of arbitrariness and abuse of discretion"), and remanding the case for further proceedings so the trial court can give due consideration to all the relevant factors in dividing the marital estate.

On remand, the trial court would not be precluded from awarding the wife a greater share of the marital estate than the husband. As I have explained in this writing, I do not believe that the current property division is equitable to the husband, but I do not intend that the husband should be entitled to an equal share of the marital estate. The wife was the model of a dutiful spouse, and she undoubtedly contributed to the marriage, mainly through noneconomic means but also, to some degree, economically, especially regarding the rental business.[9] The husband treated the wife reprehensibly, and the marriage ended despite her noble efforts to preserve the family. During the trial, the wife generously requested only half the marital property and a fair award for her support. Because she is completely faultless for the breakdown of the marriage, and the other equities of the case would support it, on remand, the trial court would be within its discretion to award her a favorable property division like the one in Yohey, just not a property division as completely one-sided as the award before us now.

---

[9]The wife and the parties' children testified that the wife had routinely tended to the rental business throughout the marriage. The wife stated that she had worked in the business at least as much as the husband.

EDWARDS, Judge, concurring in part and dissenting in part.

I concur in that part of the main opinion reversing the judgment entered by the Marion Circuit Court for failing to properly divide the costs of the previous appeal, see W.D.G. v. K.S.G., [Ms. CL-2024-0223, Nov. 15, 2024] ___ So. 3d ___ (Ala. Civ. App. 2024); otherwise, I respectfully dissent.